UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BRUCE DUNN, | * | C.A. NO. 11-495-JJB-RLB |
| Plaintiff | * | |
| | * | |
| vs. | * | JUDGE JAMES J. BRADY |
| | * | |
| JAMES LEBLANC & LOUISIANA | * | |
| DEPT. OF PUBLIC SAFETY | * | M. JUDGE RICHARD L. BOURGEOIS |

### PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

1.      The Louisiana Department of Public Safety (DPS), through its subdivision OMV, issues driver's licenses, including commercial drivers licenses, in the State of Louisiana. LA. REV. STAT. §§ 32:402, 32:401(7), 36:401(C)(1)(b).

2.      Commercial drivers are subject to skills and knowledge testing beyond that required for drivers of personal vehicles. LA. ADMIN. CODE TIT. 55, §§ 101, 103. In addition, individuals seeking CDLs must meet federally and state-required physical requirements beyond those that apply to drivers of personal vehicles. 49 C.F.R. § 391.41; LA. REV. STAT. § 32:403.4.

3.      These include minimum hearing standards, which provide that in order to qualify for a CDL, an individual must have the ability to

> First perceive a forced whisper voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard Z24.5-1951). 49 C.F.R. § 391.41(11).

4.      After successfully passing a written test, a prospective commercial driver receives a CDL learner's permit and is eligible to receive practical, on-the-road training from a school.[1]

---

[1] Watson 56:14-15, 57:7-12; Berard 8:22-25; Cox 9:9-15. Exhibits to this Statement are attachments to Plaintiff's Memorandum in Support of Summary Judgment.

1

5.    Once trained, the prospective commercial driver takes a skills test, which consists of three parts. The first part of the test is the pre-trip inspection, during which the prospective commercial driver points out various parts of the truck that need to be examined prior to driving, and explains what he is checking and why.[2] The second portion is the back-up test, during which the student must demonstrate the ability to maneuver the truck in reverse.[3] The third portion of the skills test is the on-the-road test, during which the test-taker drives the truck in traffic, accompanied by the tester.[4]

6.    All three portions of the skills test are generally conducted by a "third-party tester," a term used to describe entities that have been certified and authorized by the State of Louisiana to conduct the skills exam.[5]

7.    Third-party testers are charged with testing according to state guidelines, and are subject to audit and observation by OMV in the administration of the skills test.[6] Employees of third-party testers are not OMV employees, but they test according to standards mandated by the State, and both the testing site and the individual tester are subject to revocation of testing certification if OMV determines that skills tests are not being administered correctly, or the third party is otherwise in violation of its contract with OMV.[7]

8.    In many cases, a truck driving school where a prospective licensee receives training is also the third-party tester from whom he will take the skills test.

9.    An individual may not take a skills test unless he has a valid CDL learner's permit.[8] CDL learner's permits are valid for six months unless extended.[9]

---

[2] Exhibit 4, Langlois 25:23-25, 26:1-6; Berard 38:23-25.
[3] Langlois 26:8; Exhibit 5, Dunn 35:22-24.
[4] Langlois 26:10-11; Dunn 35:25-36:1.
[5] Watson 54:18-55:14; Langlois 6:23-25; Berard 43:15-21; Cox 8:15-24; Exhibit __, Cormier 7:13-16, 7:23-8:7.
[6] Watson 55:15-56:9; Langlois 9:23-10:2, Cox 12:5-7; Cormier 8:15-21, 11:12-12:2.
[7] Cox 8:15-24; Cormier 7:23-8:7.
[8] Watson 56:13-14, 57:7-12; Berard 41:7-9.

10.     A prospective driver who fails the skills test may retake the exam, so long as his learner's permit is valid.[10] There is no limit on the number of times a driver can retake the skills exam while his learner's permit is valid.[11]

11.     OMV officials do not normally participate in administration of the skills test. OMV consults with third-party testers on issues regarding compliance with federal and state law;[12] will observe administration of a test if it has received a complaint against a third-party tester;[13] and conducts audits of third-party testers, which may consist of covert or overt observation of the administration of skills tests.[14] During these observations, OMV will sometimes co-score the test—that is, will mark a score sheet along with the third-party tester.[15]

12.     After a prospective licensee passes the skills test, the third-party tester issues documentation showing passage of the test, which the licensee brings to an OMV field office, where his State of Louisiana CDL is issued.[16]

12.     Within OMV, there is a Driver's License section, which handles matters related to issuance of driver's licenses, including CDLs.[17]

13.     In 2010 when Bruce Dunn was attempting to obtain a CDL, Staci Hoyt held the position of OMV Administrator.[18] Within her purview in this role was the Driver's License section, which was managed at the time by Kim Watson.[19] Ms. Hoyt supervised Ms. Watson.[20]

---

[9] Exhibit 6, La. Department of Public Safety, OMV Policy & Procedure: Commercial Driver's Instruction permits, Section I, Number 1.01.
[10] Watson 66:23-67:14; Langlois 24:5-17; Cox 31:24-32:2; Berard 41:2-22; Cormier 13:5-9.
[11] Langlois 24:15-17; Watson 67:6-14; Cox 32:3-5; Berard 41:17-22, 42:18-43:1; Cormier 14:3-10.
[12] Exhibit 8, Hoyt 21:6-10.
[13] Watson 62:12-24.
[14] Watson 53:21-22, 56:2-9; Cox 12:5-7; Cormier 8:15-21, 11:12-12:2.
[15] Watson 53:20; Langlois 8:19-24, 9:23-25.
[16] Watson 59:1-23, 61:8-11; Berard 22:22-23:14.
[17] Watson 9:7-11; Hoyt 14:4-5.
[18] Hoyt 7:8-12; Ms. Hoyt currently serves as the Deputy Assistant Secretary for the Office of Motor Vehicles. Hoyt 6:3-4.
[19] Hoyt 13:25-14:5; Watson 9:7-16. Ms. Watson currently holds the title of OMV Administrator, the position Ms. Hoyt held in 2010.

14. As manager of the Driver's License section, Ms. Watson handled policy matters related to driver's licensing and reinstatement, implementation of Federal Motor Carrier Safety Administration regulations, state licensing requirements, and ensuring that OMV policies were up-to-date with federal and state law.[21]

15. In her role as section manager, Ms. Watson, in turn, supervised OMV's two CDL Consultants, who are responsible for training, certifying, and monitoring third-party examiners.[22] CDL Consultants also provide guidance to third-party examiners on compliance with federal regulations.[23]

16. At the time Bruce Dunn was attempting to obtain his CDL in 2010, OMV's two CDL Consultants were Cliff Langlois and Jim Paridon.[24]

17. Bruce Dunn enrolled in Coastal Truck Driving school ("Coastal") in April 2010. After completion of his coursework, in July 2010 he attempted to secure his license. He failed his initial exams, and was not permitted to retest.

18. Bruce Dunn has a hearing impairment. His primary spoken language is American Sign Language.[25]

19. Mr. Dunn wears a hearing aid.[26]

20. The hearing aid amplifies his ability to detect sounds, but he generally cannot understand spoken language.[27]

---

[20] Hoyt 13:25-14:1.
[21] Watson 13:3-5, 14:25-15:24.
[22] Langlois 6:21-22.
[23] Hoyt 17:18-18:2, 21:6-10.
[24] Hoyt 11:13-14; Watson 23:3-4. Mr. Langlois is currently a CDL consultant; Mr. Paridon is no longer an OMV employee.
[25] Exhibit 9, Dunn Declaration.
[26] Dunn Decl.
[27] Dunn Decl.

21. Mr. Dunn obtained a medical certification on September 3, 2009, that showed when tested on an audiometric device he could hear with an average of 40 decibels in the left ear, and 40.6 in the right ear.[28]

22. According to the examination reflected on Mr. Dunn's Medical Examination Report, Mr. Dunn met the standards prescribed in 49 C.F.R. § 391.41(b)(11).

22. When they later became aware of Mr. Dunn, OMV officials understood that Mr. Dunn's medical certification showed that he met minimum hearing requirements.[29]

23. Subsequent hearing exams, performed both to obtain DOT certification and for the purpose of maintaining and testing his hearing aids, show results that meet the federal standards.[30]

24. On July 19, 2013, Mr. Dunn was tested by an audiologist associated with Dr. Jack Breaux, Defendant's expert in this case.[31] This examination shows his hearing to range from 45 to 55 decibels at the specified frequencies.[32]

25. Dr. Breaux's report notes, however, that greater amplification of Mr. Dunn's hearing aid could produce results that meet the federal minimum, statements he confirmed in his deposition.[33]

26. On July 24, 2013, Mr. Dunn was examined by Dr. Kim Juneau, an audiologist.[34] Dr. Juneau found Mr. Dunn's hearing to be well within the federal standards, with an average hearing of 35 decibels at the specified frequencies.[35]

27. Prior to taking the exam, Mr. Dunn turned the volume on his hearing aids up.[36]

---

[28] Exhibit 10, Medical Examination Report.
[29] Exhibit 11, E-mail dated 8/25/10 from Kimberly Watson to DeWayne White.
[30] Exhibit 12, Records relating to audiology examinations performed on Bruce Dunn.
[31] Exhibit 13, Report of Dr. Jack Breaux, Jr., dated July 22, 2013.
[32] *Id.*
[33] *Id.*; Exhibit 14, Breaux 8:23-9:4.
[34] Exhibit 15, Report of Dr. Kim Juneau, dated July 24, 2013; Exhibit 16, Juneau 7:24.
[35] Juneau Report; Juneau 26:1-3.
[36] Dunn Decl.

28.     Mr. Dunn had not adjusted the volume to his hearing aids prior to taking the audiology exam in Dr. Breaux's office.[37]

29.     Dr. Juneau tested Mr. Dunn's hearing aids, and found the devices to be capable of producing enough amplification to allow a person with Mr. Dunn's unaided hearing results to achieve the aided results he obtained.[38]

30.     Thus Dr. Juneau, consistently with a variety of tests conducted by different audiologists over the past three years, shows that Mr. Dunn has aided hearing sufficient to meet federal minimums.

31.     Dr. Breaux found different results, but was adamant in his report and deposition that adjustment to Mr. Dunn's hearing aids could provide better hearing results.[39]

32.     Dr. Breaux testified that adjustment of hearing aids could explain the variation among Mr. Dunn's tests,[40] and that "adjustment" of a hearing aid includes the use of volume control by the wearer.[41]

33.     In late 2008, Mr. Dunn sought to improve his earning potential, and began to research becoming a truck driver.[42]

34.     Prior to enrolling in truck driving school, Mr. Dunn researched whether his hearing impairment would present a barrier to holding a CDL.[43] Mr. Dunn took a "DOT physical," a physical exam prescribed by the state and federal governments, including the hearing standard cited provided at 49 C.F.R. §391.41(11).

---

[37] Dunn Decl.
[38] Juneau Report; Juneau 21:20-22:25; 37:18-38:13.
[39] Breaux 8:23-9:4, 14:18-21.
[40] Breaux 14:18-21.
[41] Breaux 23:19-24:10.
[42] Dunn 22:22-23:1.
[43] Dunn 23:12-17.

6

35.     Based on the examination showing he met federal standards, Mr. Dunn approached Coastal regarding enrollment, and met with Stephanie Berard, who was acting as an admissions representative and administrative assistant at Coastal Truck Driving School in the spring of 2010.[44]

36.     Ms. Berard sent Mr. Dunn's information to her contact at the federal Department of Transportation, Esther Oatis, who works with individuals who do not meet the federal physical requirements and are requesting waivers of those requirements.[45]

37.     Ms. Oatis responded that Mr. Dunn did not need a waiver, because he met the physical requirements for commercial drivers, so Ms. Berard proceeded to enroll Mr. Dunn in Coastal's CDL training program.[46]

38.     Mr. Dunn attended a 160-hour program in April and May of 2010.[47] Throughout his schooling, he was aided by a sign-language interpreter, who interpreted the voiced information presented by instructors.[48]

39.     Based on a provision in the FMSC regulations that provides that commercial drivers must be able to "read and speak the English language sufficient to converse with the general public , to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records," Ms. Berard consulted with federal and state personnel regarding the conduct of Mr. Dunn's test. As a result of these conversations she understood that Mr. Dunn would be able to write his answers during the pre-trip inspection portion of the exam, which requires the test-taker to verbally demonstrate his knowledge of a commercial vehicle.[49]

---

[44] Berard 10:23-24.
[45] Berard 19:2-4.
[46] Berard 20:3-21:13, Exhibit 2 to Berard Deposition.
[47] Dunn 30:7-19.
[48] Dunn 29:14-17.
[49] Berard 32:8-19.

40.     In June 2010, Ms. Berard spoke to an individual at FMSCA in Atlanta and described Mr. Dunn as deaf and mute, and was told Mr. Dunn could write his answers to questions during the test; she confirmed this conversation in e-mail, and received a response in return from Pearlie Robinson, who is listed on the e-mail as Health and Welfare Specialist, USDOT/FMSCA, and whose e-mail address is pearlie.robinson@dot.gov.[50]

41.     The e-mail from Pearlie Robinson states, "we have established that the driver is mute but is able to hear according to the physical qualifications standards under 49 CFR 391.41 of the Federal Motor Safety Regulations," and confirms that Mr. Dunn would be permitted to "satisfy the communication aspect" of the skills test by "communicating and explaining in writing during the tests as long as nothing is prewritten."[51]

42.     Ms. Berard recalls speaking to personnel with the federal Department of Transportation, sending a confirming e-mail, and receiving this response.[52]

43.     Normally when a student finishes the coursework, Coastal simply schedules a student's skills test in accordance with tester and student availability.[53]

45.     The skills test is administered by a tester employed by Coastal and certified by Office of Motor Vehicles.[54] OMV is usually not involved.

46.     In Mr. Dunn's case, OMV personnel became involved because it was unclear how Mr. Dunn would be able to go through the pre-trip inspection, which normally involves vocalization.[55]

47.     A skills test was scheduled for July 16, 2010.

48.     Generally a test is conducted with just the tester and the student.[56]

---

[50] Berard 30:1-18, 31:7-25, 32:1-13; Exhibit 3 ("Berard 3") to the Deposition of Stephanie Berard, attached to this memorandum as Exhibit 17.
[51] Berard 3, Deposition of Stephanie Berard.
[52] Berard 29-32.
[53] Berard 25:4-9, 27:1-5; Cox 18:12-24.
[54] Cox 18:12-24.
[55] Langlois 10:24-11:8; Berard 33:23-34:15, Cox 27:8-19.

49. Occasionally one or both of OMV's CDL Consultants occasionally observe or co-score a skills test.[57]

50. Mr. Dunn's initial skills test was attended by four OMV employees—the two CDL Consultants, Cliff Langlois and Jim Paridon, and two additional employees, Kimberly Watson and Vicki Scott—in addition to his examiner, Mark Hawkins.[58]

51. At Ms. Watson's instruction, Clifton Langlois videotaped the examination.[59]

52. Though OMV personnel observe skills examinations routinely, Defendants were able to identify only four occasions in the past five years when examinations were videotaped.[60]

53. Michael Cormier, an instructor and tester who has been employed at Coastal since 2003, has, to his knowledge, never conducted a test that was videotaped.[61]

54. Mr. Dunn was not permitted to write his answers during the pre-trip inspection.[62]

55. Instead, he was forced to gesture at parts of the truck and attempt to vocalize his answers.[63]

56. Mr. Langlois did not permit Mr. Dunn to write his answers down because OMV does not "let anyone else do that."[64]

57. It was OMV's intention, in testing Mr. Dunn, not to make modifications to the testing process.[65]

58. The federal regulations that govern testing prohibit use of an interpreter, but do not prohibit other modifications to the testing process.[66]

---

[56] Berard 35:24; Cox 21:13-19.
[57] Langlois 9:15-25; Watson 53:15-22; Cox 21:8-19.
[58] Berard 34:23-35:16; Dunn 48:19-25; 49:1-25; Exhibit 18, Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, Interrogatory #1.
[59] Langlois 12:25-13:1; Watson 28:23-29:1.
[60] Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, Interrogatory #14.
[61] Cormier 12:3-8.
[62] Watson 38:15-20; Langlois 28:10-16.
[63] Langlois 23:20-25; Watson 38:15-20; Dunn 46:17-24, 48:2-5.
[64] Langlois 28:16.
[65] Watson 31:22-32:9.

59. Mr. Dunn had not expected so many people present at his test and had not been told the exam would be videotaped.[67]

60. He was overwhelmed and nervous.[68]

61. Mr. Dunn failed the pre-trip inspection test.[69]

62. A second test was scheduled for July 28, 2010. On this occasion, Ms. Watson and Ms. Scott were not present. Mr. Langlois again videotaped the examination.

63. Mr. Dunn took the backing test rather than the pre-trip inspection.[70]

64. He again failed.

65. Normally, an individual with a valid CDL learner's permit who fails any portion of the skills test may retake the test, so long as his learner's permit is valid.[71]

66. There is a forty-eight-hour waiting period between the failure and the re-take, but otherwise no limit on the number of times an individual who fails the skills test may retake his exam.[72]

67. Generally, a Coastal student who has failed reschedules his test, allowing for the required delay.[73]

68. Coastal employees Kacey Cox, who schedules skills tests, and Michael Cormier, who conducts examinations, cannot recall ever refusing to retest a student who had failed on an initial or subsequent attempts.[74]

---

[66] 49 C.F.R. 383.133(b)(5).
[67] Dunn 49:18-50:8.
[68] Dunn 49:1, 9-10.
[69] Berard 41:23-25; Watson, Langlois, Cox.
[70] Dunn 69:2-10.
[71] Langlois 24:15-17; Watson 67:6-14; Cox 31:24-32:12; Berard 41:17-22, 42:18-43:1; Cormier 13:5-9.
[72] Langlois 24:15-17; Watson 67:6-14; Cox 32:3-5, 32:12; Berard 41:17-22, 42:18-43:1; Cormier 14:9-10.
[73] Berard 41:10-22, 42:18-43:1.
[74] Cox 32:12, Cormier 14:9-10.

69.     In the case of Mr. Dunn, Coastal did not reschedule Mr. Dunn's exam because of OMV's involvement.[75] Ms. Cox testified that Coastal "was on hold with the State" as to retesting Mr. Dunn.[76]

70.     This is not typical, as normally a student can simply reschedule a test after failing; Coastal has no obligation to inform the State that a particular student has failed multiple times and wants to continue retesting.[77]

71.     Mr. Dunn contacted Ms. Watson regarding the status of his application, and Ms. Watson replied to him by e-mail on August 25, 2010, "During our last meeting at Coastal and in a previous email, I advised you that this case is under review. Once the review has been completed by Federal Motor Carrier and Highway Safety, I will notify you. At this point, there is no further action required on your part . . .."[78]

72.     Between Mr. Dunn's second skills test on July 28, 2010, and September 13, 2010, OMV conducted a review of Mr. Dunn's application for license.

73.     This review involved sending a DVD of the video of Mr. Dunn's skills test to various DPS personnel, individuals with the Federal Motor Carrier Safety Administration ("FMSCA"), and internal communications among DPS personnel.

74.     By e-mail to Ms. Watson and Ms. Hoyt, William Norris of FMSCA to OMV's inquiry that it would be "inappropriate for us to tell a State whether they can or cannot (should or should not) license a particular individual."[79]

75.     Mr. Norris noted the requirement that an individual be able to read and speak the English language, but also stated, "there is no requirement that States conduct an English proficiency test

---

[75] Berard 42:3-14; Cox 31:21-25, 32:1-4.
[76] Cox 32:21-25.
[77] *Id.*
[78] Exhibit 19, E-mail from Kimberly Watson to Bruce Dunn, 8/25/10.
[79] Exhibit 20, E-mail from William Norris to Kimberly Watson and Staci Hoyt, 9/5/10.

11

during the licensing process. FMCSA has reiterated in recent press inquiries that there is not currently any direct English-only licensing process."[80]

76. Mr. Norris went on to cite the hearing standard provided in 49 C.F.R. § 391.41, and suggested that if the State doubted Mr. Dunn's medical qualifications, it could request that he be tested by a different doctor, or have his case reviewed by its medical board.[81]

77. FMSCA left final determination as to Plaintiff's license to OMV's discretion.[82]

78. The State did not require Mr. Dunn to be tested by a different doctor or refer Mr. Dunn's application to its medical advisory board.[83]

79. Ms. Watson consulted with Major DeWayne White, who in turn consulted with State Police Wallace Davidson and Mark Morrison, all of the Louisiana State Police.[84] In her e-mail to Major White, Ms. Watson noted that Mr. Dunn "provided a medical audio form completed by his physician that passes federal guidelines; it is obvious that he cannot hear a forced whisper as required by Federal Regulations (see DVD); he also cannot clearly verbally communicate as required by Federal Regulations (see DVD)."[85]

80. Major White responded that he did not meet the qualifications to be issued a commercial driver's license "because he is incapable of speaking English, as required in 49CFR391."[86] Major White further noted that Mr. Dunn "failed to respond to questions asked of him by persons in close proximity to him in all likelihood due to his loss of hearing. It is our opinion the inspectors required him to perform the "low air" test over again due to his lack of understanding the first time he

---

[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Dunn Decl., Watson 79:5-18; Hoyt 58:13-59:6. Defendant's responses to Plaintiff's Interrogatories and Requests for Production contain no statements or documents showing a referral by OMV or DPS of Mr. Dunn's application to OMV's medical advisory board.
[84] DeWayne White is no longer employed by DPS.
[85] Exhibit 11.
[86] Exhibit 21, Email, 9/10/2010, from DeWayne White to Kimberly Watson

attempted to perform the test due to his inability to communicate and comprehend. With that said, it is our collective opinion that Mr. Dunn should be denied a CDL because he fails to meet the requirements in 391." Major White noted that he had consulted with Wallace Davidson and Mark Morrison in making this decision.[87]

81. Major Wallace Davidson, who is now and was in 2010 in the section of the state police that regulates vehicle size and weight, states that he did not see anything on the tape that would involve his division, and he was not involved in the decision whether or not to license Mr. Dunn.[88]

82. Major Mark Morrison is and was in 2010 in the Motor Carrier Section of the State Police.[89] This section regulates commercial motor vehicles and enforces federal and state regulations pertaining to motor carriers and commercial drivers.[90] Major Morrison testified that he recalls watching the video, but does not recall being asked for an opinion, or having an opinion, regarding Mr. Dunn.[91] He further testified that if an applicant can meet federal guidelines, he or she should be allowed to obtain a CDL.[92]

84. Staci Hoyt testified, "I understand what's on his medical [certification]. I also understand what's on the video [of Mr. Dunn's test]. . . . And they are conflicting."[93]

85. Ms. Hoyt made this determination despite not having seen the video; she testified she only heard it from down the hall as other OMV employees watched it.[94]

86. Ms. Hoyt believes that in order to safely drive a commercial vehicle, a driver would "have to be able to hear train horns, any type of horn that would prevent a public safety concern. You have to be able to communicate with law enforcement."[95]

---

[87] *Id.* Majors Davidson and Morrison were, in September 2010, Captains in their respective divisions of the State Police.
[88] Davidson 9:8-25; 10:10-13.
[89] Morrison 5:14-16.
[90] Morrison 5:21-6:1, 7:9-11.
[91] Morrison 16:10-12.
[92] Morrison 17:16-19.
[93] Hoyt 47:19-22.
[94] Hoyt 22:22-23:8.

87. Ms. Watson interprets the ability to hear a forced whisper as an "absolute requirement" under the federal regulations.[96]

88. She testified that the results shown on Mr. Dunn's medical certification "did not match up . . . with being able to hear a forced whisper."[97]

89. Ms. Watson believed, based on her observation, that it would be unsafe for Mr. Dunn to drive, due to his hearing disability.[98]

90. Ms. Watson could not recall, and defendants have not produced, any record of inquiry made with Mr. Dunn or anyone else regarding how a deaf person might address their safety concerns.[99]

91. At least one of the concerns OMV officials raised[100]—Mr. Dunn's ability to hear the low-air-pressure alarm during his pre-trip inspection—can be addressed through a non-auditory alarm. Cliff Langlois, OMV CDL consultant, and licensed commercial vehicle driver, testified that some trucks are equipped with visual, lighted alarms, rather than the audible alarm.[101]

92. Plaintiff discussed another method of accommodating his disability in his deposition, a practice of inserting a soapy solution in an air hose to determine, based on the appearance of suds; this alerts the driver to any leaks in the hose without relying on sounds emitting from the hose.[102]

93. Had OMV approached Plaintiff with actual concerns about his disability, in 2010 or later, Plaintiff would have provided them with contact information for commercial drivers who are deaf

---

[95] Hoyt 47:10-15.
[96] Watson 50:24-51:3.
[97] Watson 50:15-18.
[98] Watson 86:23-87:6, 88:4-8.
[99] Watson 87:7-11, 88:13-18; Exhibit 22, Defendant's Responses to Plaintiff's Requests for Production of Documents, Request #10, and Exhibit 3 attached thereto, and Supplemental to Plaintiff's Requests for Production of Documents #10, and Exhibit B attached thereto.
[100] Watson 91:6-8; Hoyt 48:2-3.
[101] Langlois 21:23-25.
[102] Dunn 67:7-23.

and who have real-world experience in managing a commercial vehicle as a hearing-impaired individual.[103]

94. OMV officials did not approach Mr. Dunn their concerns and inquire how he intended to drive safely, given his hearing impairment.[104]

95. OMV officials did not ask Mr. Dunn to see another doctor and have his hearing re-evaluated.[105]

96. OMV officials did not submit Mr. Dunn's application to its Medical Advisory Board.

97. On September 13, 2010, Ms. Watson wrote a letter to Kacey Cox of Coastal, with a copy to Mr. Dunn. She stated, without elaboration, that Mr. Dunn did not meet the requirements of Federal Motor Carrier Safety regulations.[106]

98. Ms. Hoyt and Ms. Watson testified that the decision finding Mr. Dunn to be unqualified was a collective one; Ms. Watson admitted producing the letter and stated she agreed with the decision it conveyed.[107]

99. Following Ms. Watson's letter, Mr. Dunn attempted to contact Ms. Watson for clarification.

100. On September 24, 2010, Mr. Dunn wrote Ms. Watson and asked, "Kim, why did you not answer my last question?"[108]

101. Ms. Watson did not respond to his inquiries for further information.[109]

102. Plaintiff requested through discovery production of all documents, records and recordings concerning plaintiff Bruce Dunn, including but not limited to . . . communications between plaintiff and the Louisiana Department of Public Safety and Corrections, the Office of Motor Vehicles. . . ."

---

[103] Dunn Decl.
[104] Dunn Decl.
[105] Dunn Decl.
[106] Exhibit 23, September 13, 2010 letter from Kimberly Watson to Kacey Cox.
[107] Hoyt 43:16-23, Watson 92:10-13.
[108] Exhibit 19, 9/24/10 e-mail from Bruce Dunn to Kimberly Watson
[109] Dunn 82:15-17.

In its response to this request, Defendants produced no documents that can be construed as an answer to Mr. Dunn's request for more information from Ms. Watson.[110]

103.   Following the filing of this complaint, Plaintiff took up residence in Florida in order to obtain a commercial driver's license there.[111]

104.   He attended school and passed the licensing exam, obtaining his Florida CDL in June 2012.[112]

105.  In December, Plaintiff went to his local OMV field office and obtained a Louisiana CDL on the basis of his Florida license, thus bypassing the need to take a skills test in Louisiana.

106. In February 2012, the federal Department of Transportation issued a rule permitting the licensing of 40 individuals who had applied for waivers of the FMSCA hearing requirements.[113]

107.   Mr. Dunn did not and has not applied for such waiver because he meets the minimum hearing requirements established in 49 C.F.R. §391.41(11).

108.   Defendant has admitted receiving Federal financial assistance and the State of Louisiana budget published by the Louisiana Division of Administration show that DPS receives federal monies.[114]

Date: September 13, 2013

---

[110] Exhibit 22.
[111] Dunn 88:18-25.
[112] Dunn Decl., Exhibit 24, Records pertaining to Mr. Dunn's training for and obtaining a CDL in the State of Florida.
[113] Exhibit 25, Fed. Register Vol. 78, No. 22, 2/1/2013, pp. 7479-84.
[114] Exhibit 26.

Respectfully submitted,

s/ Susan Meyers
Susan Meyers, La. Bar No. 29346
Advocacy Center
1010 Common Street, Suite 2600
New Orleans, Louisiana 70112
Telephone: 504-522-2337, ext. 138
Facsimile: 504-522-5507
smeyers@advocacyla.org

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2013, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

s/ Susan M. Meyers
Susan M. Meyers, T.A., La. Bar No. 29346
Advocacy Center
1010 Common Street, Suite 2600
New Orleans, Louisiana 70112
Telephone: 504-522-2337, ext. 138
Facsimile: 504-522-5507
smeyers@advocacyla.org