UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BRUCE DUNN, | * | C.A. NO. 11-495-JJB-RLB |
| Plaintiff | * | |
| | * | |
| vs. | * | JUDGE JAMES J. BRADY |
| | * | |
| JAMES LEBLANC & LOUISIANA | * | |
| DEPT. OF PUBLIC SAFETY | * | M. JUDGE RICHARD L. BOURGEOIS |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This is an action under Title II of the Americans with Disabilities Act Rehabilitation Act

("ADA") of 1973, 29 U.S.C. §794,[1] for damages stemming from the perpetration of discrimination

on the basis of disability by the Louisiana Office of Motor Vehicles (OMV). OMV is an office

within the Louisiana Department of Public Safety, which in turn is led by Secretary James LeBlanc,

the principal defendant in this action, named in his official capacity.

The Plaintiff, Bruce Dunn, has a hearing impairment. Though Mr. Dunn meets the

minimum hearing requirements prescribed in federal regulations, OMV officials doubted his ability

to safely drive a truck due to his hearing impairment.

OMV licenses commercial truck drivers in the State of Louisiana. OMV enters into contracts

with outside entities to administer a portion of the commercial drivers license (CDL) examination

commonly referred to as the "skills test." Because of this disability, OMV officials participated in the

portion of the licensing exam usually left to a third-party tester. During this examination, OMV

---

[1] The First Amended Complaint requests both damages and injunctive relief, under the Rehabilitation Act and Title II of the Americans with Disabilities Act. Since the filing of the First Amended Complaint, the Plaintiff, Bruce Dunn, has obtained his commercial driver's license. Nonetheless, Plaintiff is subject to revocation of his license by the Louisiana Department of Motor Vehicles, and maintains his claims for declaratory and injunctive relief.

officials subjected Mr. Dunn to unusual and discriminatory testing conditions, making no attempt to communicate with Mr. Dunn in an effective manner, though it was clear he could not understand them due to his hearing impairment. Officials also required that he attempt to vocalize his answers. Mr. Dunn failed this portion of this exam, and subsequently had a single retest, which he also failed. Though there is no limit on the number of times an individual can take the CDL licensing exam, OMV place Mr. Dunn's application under review, during which he was not permitted to retest. OMV's review period lasted until shortly after his learner's permit expired, when OMV Assistant Headquarters Administrator Kim Watson finally notified him that it had determined he was unqualified to hold a CDL. He filed this lawsuit seeking injunctive and declaratory relief, as well as damages.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the record discloses "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of identifying those portions of the pleadings and the discovery in the case that demonstrate the absence of a genuine issue of material fact. *Duffie v. US*, 600 F.3d 362, 371 (5th Cir.2010); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514 (1986); *Bustos v. Martini Club Inc.*, 599 F.3d 458, 468 (5th Cir.2010). The nonmoving party may not rest on the allegations and denials contained in its pleadings, but must show by affidavits or other competent summary judgment evidence "specific facts" that show there is a genuine issue for trial. *Id.*

### III.  ABSENCE OF MATERIAL FACT ISSUES

**A.    CDL Licensing Program**

The Louisiana Department of Public Safety (DPS), through its subdivision OMV, issues driver's licenses, including commercial drivers licenses, in the State of Louisiana. LA. REV. STAT. §§ 32:402, 32:401(7), 36:401(C)(1)(b). Commercial drivers are subject to skills and knowledge testing beyond that required for drivers of personal vehicles. LA. ADMIN. CODE TIT. 55, §§ 101, 103. In addition, individuals seeking CDLs must meet federally and state-required physical requirements beyond those that apply to drivers of personal vehicles. 49 C.F.R. § 391.41; LA. REV. STAT. § 32:403.4. These include minimum hearing standards, which provide that in order to qualify for a CDL, an individual must have the ability to

> First perceive a forced whisper voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard Z24.5-1951). 49 C.F.R. § 391.41(11).

Prior to issuing a CDL to an individual who does not already possess one,[2] OMV gives a written test (the "knowledge test") to a prospective licensee.[3] After passing the knowledge test, a prospective commercial driver receives a CDL learner's permit. He is then eligible to receive practical, on-the-road training from a school.[4] Eventually he takes the skills test.[5] The skills test consists of three parts. The first part of the test is the pre-trip inspection, during which the prospective commercial driver points out various parts of the truck that need to be examined prior

---

[2] The Louisiana OMV also issues CDLs to individuals who have obtained a CDL in another State. In such cases, the usual procedure is for the licensed individual to bring his license to an OMV field office and have a Louisiana CDL issued. His license from the other state is destroyed. The procedure described in this and subsequent paragraphs applies to those who are obtaining a first-time CDL in Louisiana.

[3] Exhibit 1, Watson 56:13-15, 57:16-25; Exhibit 2, Berard 7:15-23; Exhibit 3, Cox 8:3-6. Depositions in this memorandum are cited by the name of the deponent, page, and line number. Sensitive personal information has been redacted from all exhibits in compliance with this court's rules.

[4] Watson 56:14-15, 57:7-12; Berard 8:22-25; Cox 9:9-15.

[5] Watson 57:20-23; Berard 9:20-10:14.

3

to driving, and explains what he is checking and why.[6] The second portion is the back-up test, during which the student must demonstrate the ability to maneuver the truck in reverse.[7] The third portion of the skills test is the on-the-road test, during which the test-taker drives the truck in traffic, accompanied by the tester.[8]

All three portions of the skills test are generally conducted by a "third-party tester," a term used to describe entities that have been certified and authorized by the State of Louisiana to conduct the skills exam.[9] OMV does not administer the skills test to first-time licensees.[10] Third-party testers are charged with testing according to state guidelines, and are subject to audit and observation by OMV in the administration of the skills test.[11] Employees of third-party testers are not OMV employees, but they test according to standards mandated by the State, and both the testing site and the individual tester are subject to revocation of testing certification if OMV determines that skills tests are not being administered correctly, or the third party is otherwise in violation of its contract with OMV.[12] In many cases, a truck driving school where a prospective licensee receives training is also the third-party tester from whom he will take the skills test.

An individual may not take a skills test unless he has a valid CDL learner's permit.[13] CDL learner's permits are issued by OMV upon passage of the knowledge test,[14] and are valid for six months unless extended.[15] A prospective driver who fails the skills test may retake the exam, so long

---

[6] Exhibit 4, Langlois 25:23-25, 26:1-6; Berard 38:23-25.
[7] Langlois 26:8; Exhibit 5, Dunn 35:22-24.
[8] Langlois 26:10-11; Dunn 35:25-36:1.
[9] Watson 54:18-55:14; Langlois 6:23-25; Berard 43:15-21; Cox 8:15-24; Exhibit 6, Cormier 7:13-16, 7:23-8:7.
[10] Watson 58:5-9; Langlois 8:17-19.
[11] Watson 55:15-56:9; Langlois 9:23-10:2, Cox 12:5-7; Cormier 8:15-21, 11:12-12:2.
[12] Cox 8:15-24; Cormier 7:23-8:7.
[13] Watson 56:13-14, 57:7-12; Berard 41:7-9.
[14] Watson 56:13-14.
[15] Exhibit 7, La. Department of Public Safety, OMV Policy & Procedure: Commercial Driver's Instruction permits, Section I, Number 1.01.

4

as his learner's permit is valid.[16] There is no limit on the number of times a driver can retake the skills exam while his learner's permit is valid.[17]

OMV officials do not normally participate in administration of the skills test. OMV consults with third-party testers on issues regarding compliance with federal and state law;[18] will observe administration of a test if it has received a complaint against a third-party tester;[19] and conducts audits of third-party testers, which may consist of covert or overt observation of the administration of skills tests.[20] During these observations, OMV will sometimes co-score the test—that is, will mark a score sheet along with the third-party tester.[21]

After a prospective licensee passes the skills test, the third-party tester issues documentation showing passage of the test, which the licensee brings to an OMV field office, where his State of Louisiana CDL is issued.[22]

## B.    OMV Organization and Personnel

Within OMV, there is a Driver's License section, which handles matters related to issuance of driver's licenses, including CDLs.[23] In 2010 when Bruce Dunn was attempting to obtain a CDL, Staci Hoyt held the position of OMV Administrator.[24] Within her purview in this role was the Driver's License section, which was managed at the time by Kim Watson.[25] Ms. Hoyt supervised Ms. Watson.[26] As manager of the Driver's License section, Ms. Watson handled policy matters related to driver's licensing and reinstatement, implementation of Federal Motor Carrier Safety Administration

---

[16] Watson 66:23-67:14; Langlois 24:5-17; Cox 31:24-32:2; Berard 41:2-22; Cormier 13:5-9.
[17] Langlois 24:15-17; Watson 67:6-14; Cox 32:3-5; Berard 41:17-22, 42:18-43:1; Cormier 14:3-10.
[18] Exhibit 8, Hoyt 21:6-10.
[19] Watson 62:12-24.
[20] Watson 53:21-22, 56:2-9; Cox 12:5-7; Cormier 8:15-21, 11:12-12:2.
[21] Watson 53:20; Langlois 8:19-24, 9:23-25.
[22] Watson 59:1-23, 61:8-11; Berard 22:22-23:14.
[23] Watson 9:7-11; Hoyt 14:4-5.
[24] Hoyt 7:8-12; Ms. Hoyt currently serves as the Deputy Assistant Secretary for the Office of Motor Vehicles. Hoyt 6:3-4.
[25] Hoyt 13:25-14:5; Watson 9:7-16. Ms. Watson currently holds the title of OMV Administrator, the position Ms. Hoyt held in 2010.
[26] Hoyt 13:25-14:1.

5

regulations, state licensing requirements, and ensuring that OMV policies were up-to-date with federal and state law.[27]

In her role as section manager, Ms. Watson, in turn, supervised OMV's two CDL Consultants, who are responsible for training, certifying, and monitoring third-party examiners.[28] CDL Consultants also provide guidance to third-party examiners on compliance with federal regulations.[29] At the time Bruce Dunn was attempting to obtain his CDL in 2010, OMV's two CDL Consultants were Cliff Langlois and Jim Paridon.[30]

## C.     Bruce Dunn

Bruce Dunn enrolled in Coastal Truck Driving school ("Coastal") in April 2010. After completion of his coursework, in July 2010 he attempted to secure his license. He failed his initial exams, and was not permitted to retest.

### 1.     Hearing Ability

Bruce Dunn has a hearing impairment.  His primary spoken language is American Sign Language.[31] Mr. Dunn wears a hearing aid.[32] The hearing aid amplifies his ability to detect sounds, but he generally cannot understand spoken language.[33]

Mr. Dunn obtained a medical certification on September 3, 2009, that showed when tested on an audiometric device he could hear with an average of 40 decibels in the left ear, and 40.6 in the right ear.[34] Thus, according to this examination, Mr. Dunn met the standards prescribed in 49 C.F.R.

---

[27] Watson 13:3-5, 14:25-15:24.
[28] Langlois 6:21-22.
[29] Hoyt 17:18-18:2, 21:6-10.
[30] Hoyt 11:13-14; Watson 23:3-4. Mr. Langlois is currently a CDL consultant; Mr. Paridon is no longer an OMV employee.
[31] Exhibit 9, Dunn Declaration.
[32] Dunn Decl.
[33] Dunn Decl.
[34] Exhibit 10, Medical Examination Report.

§ 391.41(b)(11). When they later became aware of Mr. Dunn, OMV officials understood that Mr. Dunn's medical certification showed that he met minimum hearing requirements.[35]

Subsequent hearing exams, performed both to obtain DOT certification and for the purpose of maintaining and testing his hearing aids, show results that meet the federal standards.[36] On July 19, 2013, Mr. Dunn was tested by an audiologist associated with Dr. Jack Breaux, Defendant's expert in this case.[37] This examination shows his hearing to range from 45 to 55 decibels at the specified frequencies.[38] Dr. Breaux's report notes, however, that greater amplification of Mr. Dunn's hearing aid could produce results that meet the federal minimum, statements he confirmed in his deposition.[39]

Five days later, on July 24, 2013, Mr. Dunn was examined by Dr. Kim Juneau, an audiologist.[40] Dr. Juneau found Mr. Dunn's hearing to be well within the federal standards, with an average hearing of 35 decibels at the specified frequencies.[41] Prior to taking the exam, Mr. Dunn turned the volume on his hearing aids up.[42] Mr. Dunn had not adjusted the volume to his hearing aids prior to taking the audiology exam in Dr. Breaux's office.[43] In addition, Dr. Juneau tested Mr. Dunn's hearing aids, and found the devices to be capable of producing enough amplification to allow a person with Mr. Dunn's unaided hearing results to achieve the aided results he obtained.[44] Thus Dr. Juneau, consistently with a variety of tests conducted by different audiologists over the past three years, shows that Mr. Dunn has aided hearing sufficient to meet federal minimums. Dr. Breaux found different results, but was adamant in his report and deposition that adjustment to Mr.

---

[35] Exhibit 11, E-mail dated 8/25/10 from Kimberly Watson to DeWayne White.
[36] Exhibit 12, Records relating to audiology examinations performed on Bruce Dunn.
[37] Exhibit 13, Report of Dr. Jack Breaux, Jr., dated July 22, 2013.
[38] *Id.*
[39] *Id.*; Exhibit 14, Breaux 8:23-9:4.
[40] Exhibit 15, Report of Dr. Kim Juneau, dated July 24, 2013; Exhibit 16, Juneau 7:24.
[41] Juneau Report; Juneau 26:1-3.
[42] Dunn Decl.
[43] Dunn Decl.
[44] Juneau Report; Juneau 21:20-22:25; 37:18-38:13.

Dunn's hearing aids could provide better hearing results.[45] He further testified that adjustment of hearing aids could explain the variation among Mr. Dunn's tests,[46] and that "adjustment" of a hearing aid includes the use of volume control by the wearer.[47] Thus, there is no material difference in the conclusions of the two experts, or among the tests produced by professionals over the course of the past several years.

2.     **Enrollment in Coastal Truck Driving School**

In late 2008, Mr. Dunn sought to improve his earning potential, and began to research becoming a truck driver.[48] Prior to enrolling in truck driving school, Mr. Dunn researched whether his hearing impairment would present a barrier to holding a CDL.[49] Mr. Dunn took a "DOT physical," a physical exam prescribed by the state and federal governments, including the hearing standard cited in III.A, *infra*. Based on the examination showing he met federal standards, Mr. Dunn approached Coastal regarding enrollment.[50] He met with Stephanie Berard, who was acting as an admissions representative and administrative assistant at Coastal Truck Driving School in the spring of 2010.[51] Ms. Berard sent Mr. Dunn's information to her contact at the federal Department of Transportation, Esther Oatis, who works with individuals who do not meet the federal physical requirements and are requesting waivers of those requirements.[52] Ms. Oatis responded that Mr. Dunn did not need a waiver, because he met the physical requirements for commercial drivers, so Ms. Berard proceeded to enroll Mr. Dunn in Coastal's CDL training program.[53]

---

[45] Breaux 8:23-9:4, 14:18-21.
[46] Breaux 14:18-21.
[47] Breaux 23:19-24:10.
[48] Dunn 22:22-23:1.
[49] Dunn 23:12-17.
[50] Dunn  23:12-17.
[51] Berard 10:23-24.
[52] Berard 19:2-4.
[53] Berard 20:3-21:13

Mr. Dunn attended a 160-hour program in April and May of 2010.[54] Throughout his

schooling, he was aided by a sign-language interpreter, who interpreted the voiced information

presented by instructors.[55]

**3.      Skills Tests**

Following completion of a 160-hour course with Coastal, Mr. Dunn prepared to take the

skills portion of the test. Based on a provision in the FMSC regulations that provides that

commercial drivers must be able to "read and speak the English language sufficient to converse with

the general public , to understand highway traffic signs and signals in the English language, to

respond to official inquiries, and to make entries on reports and records."[56] Ms. Berard consulted

with federal and state personnel regarding the conduct of Mr. Dunn's test. As a result of these

conversations she understood that Mr. Dunn would be able to write his answers during the pre-trip

inspection portion of the exam, which requires the test-taker to verbally demonstrate his knowledge

of a commercial vehicle.[57] In June 2010, Ms. Berard spoke to an individual at FMSCA in Atlanta and

described Mr. Dunn as deaf and mute, and was told Mr. Dunn could write his answers to questions

during the test; she confirmed this conversation in e-mail, and received a response in return from

Pearlie Robinson, who is listed on the e-mail as Health and Welfare Specialist, USDOT/FMSCA,

and whose e-mail address is pearlie.robinson@dot.gov.[58] The e-mail from Pearlie Robinson states,

"we have established that the driver is mute but is able to hear according to the physical

qualifications standards under 49 CFR 391.41 of the Federal Motor Safety Regulations," and

confirms that Mr. Dunn would be permitted to "satisfy the communication aspect" of the skills test

---

[54] Dunn 30:7-19.
[55] Dunn 29:14-17.
[56] The parties dispute the applicability of this requirement to the licensing process as a matter of law, as further explained in III.2.b, *infra*.
[57] Berard 32:8-19.
[58] Berard 30:1-18, 31:7-25, 32:1-13; Exhibit 3 ("Berard 3") to the Deposition of Stephanie Berard, attached to this memorandum as Exhibit 17.

9

by "communicating and explaining in writing during the tests as long as nothing is prewritten."[59] Ms. Berard recalls speaking to personnel with the federal Department of Transportation, sending a confirming e-mail, and receiving this response.[60]

Normally when a student finishes the coursework, Coastal simply schedules a student's skills test in accordance with tester and student availability.[61] In 2010, Coastal would submit, each Friday, a list of students were scheduled to take the skills test, which was to be administered by a tester employed by Coastal and certified by Office of Motor Vehicles.[62] In Mr. Dunn's case, OMV personnel became involved because it was unclear how Mr. Dunn would be able to go through the pre-trip inspection, which normally involves vocalization.[63]

A skills test was scheduled for July 16, 2010, and conducted under highly unusual conditions. Generally a test is conducted with just the tester and the student.[64] Occasionally one or both of OMV's CDL Consultants occasionally observe or co-score a skills test.[65] Mr. Dunn's initial skills test was atypical in that it was attended by four OMV employees—the two CDL Consultants, Cliff Langlois and Jim Paridon, and two additional employees, Kimberly Watson and Vicki Scott—in addition to his examiner, Mark Hawkins.[66] At Ms. Watson's instruction, Clifton Langlois videotaped the examination.[67] Though OMV personnel observe skills examinations routinely, Defendants were able to identify only four occasions in the past five years when examinations were videotaped.[68]

---

[59] Berard 3, Deposition of Stephanie Berard.
[60] Berard 29-32.
[61] Berard 25:4-9, 27:1-5; Cox 18:12-24.
[62] Cox 18:12-24.
[63] Langlois 10:24-11:8; Berard 33:23-34:15, Cox 27:8-19.
[64] Berard 35:24; Cox 21:13-19.
[65] Langlois 9:15-25; Watson 53:15-22; Cox 21:8-19.
[66] Berard 34:23-35:16; Dunn 48:19-25; 49:1-25; Exhibit 18, Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, Interrogatory #1.
[67] Langlois 12:25-13:1; Watson 28:23-29:1.
[68] Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, Interrogatory #14.

Michael Cormier, an instructor and tester who has been employed at Coastal since 2003, has, to his knowledge, never conducted a test that was videotaped.[69]

Mr. Dunn was not permitted to write his answers during the pre-trip inspection.[70] Instead, he was forced to gesture at parts of the truck and attempt to vocalize his answers.[71] Mr. Langlois did not permit Mr. Dunn to write his answers down because OMV does not "let anyone else do that."[72] It was OMV's intention, in testing Mr. Dunn, not to make modifications to the testing process.[73] The federal regulations that govern testing prohibit use of an interpreter, but do not prohibit other modifications to the testing process, such as permitting the test-taker to write his answers down during the pre-trip inspection process.[74]

Mr. Dunn had not expected so many people present at his test and had not been told the exam would be videotaped.[75] He was overwhelmed and nervous.[76] He failed the pre-trip inspection test.[77]

A second test was scheduled for July 28, 2010. On this occasion, Ms. Watson and Ms. Scott were not present. Mr. Langlois again videotaped the examination. Mr. Dunn took the backing test rather than the pre-trip inspection.[78] He again failed.

**4.    OMV's Review of Mr. Dunn's Application**

Normally, an individual with a valid CDL learner's permit who fails any portion of the skills test may retake the test, so long as his learner's permit is valid.[79] There is a forty-eight-hour waiting

---

[69] Cormier 12:3-8.
[70] Watson 38:15-20; Langlois 28:10-16.
[71] Langlois 23:20-25; Watson 38:15-20; Dunn 46:17-24, 48:2-5.
[72] Langlois 28:16.
[73] Watson 31:22-32:9.
[74] 49 C.F.R. 383.133(b)(5).
[75] Dunn 49:18-50:8.
[76] Dunn 49:1, 9-10.
[77] Berard 41:23-25; Watson, Langlois, Cox.
[78] Dunn 69:2-10. Mr. Dunn is under the impression that the tests were taken out of usual order because another student was doing the pre-trip inspection at the time his test was supposed to start. The order of the tests does not appear material.

period between the failure and the re-take, but otherwise no limit on the number of times an individual who fails the skills test may retake his exam.[80] Generally, a Coastal student who has failed reschedules his test, allowing for the required delay.[81] Coastal employees Kacey Cox, who schedules skills tests, and Michael Cormier, who conducts examinations, cannot recall ever refusing to retest a student who had failed on an initial or subsequent attempts.[82]

In the case of Mr. Dunn, Coastal did not reschedule Mr. Dunn's exam because of OMV's involvement.[83] Ms. Cox testified that Coastal "was on hold with the State" as to retesting Mr. Dunn.[84] This is not typical, as normally a student can simply reschedule a test after failing; Coastal has no obligation to inform the State that a particular student has failed multiple times and wants to continue retesting.[85] Mr. Dunn contacted Ms. Watson regarding the status of his application, and Ms. Watson replied to him by e-mail on August 25, 2010, "During our last meeting at Coastal and in a previous email, I advised you that this case is under review. Once the review has been completed by Federal Motor Carrier and Highway Safety, I will notify you. At this point, there is no further action required on your part . . .."[86]

Between Mr. Dunn's second skills test on July 28, 2010, and September 13, 2010, OMV conducted a review of Mr. Dunn's application for license. This review involved sending a DVD of the video of Mr. Dunn's skills test to various DPS personnel, individuals with the Federal Motor Carrier Safety Administration ("FMSCA"), and internal communications among DPS personnel.

By e-mail to Ms. Watson and Ms. Hoyt, William Norris of FMSCA to OMV's inquiry that it would be "inappropriate for us to tell a State whether they can or cannot (should or should not)

---

[79] Langlois 24:15-17; Watson 67:6-14; Cox 31:24-32:12; Berard 41:17-22, 42:18-43:1; Cormier 13:5-9.
[80] Langlois 24:15-17; Watson 67:6-14; Cox 32:3-5, 32:12; Berard 41:17-22, 42:18-43:1; Cormier 14:9-10.
[81] Berard 41:10-22, 42:18-43:1.
[82] Cox 32:12, Cormier 14:9-10.
[83] Berard 42:3-14; Cox 31:21-25, 32:1-4.
[84] Cox 32:21-25.
[85] Id.
[86] Exhibit 19, E-mail from Kimberly Watson to Bruce Dunn, 8/25/10.

license a particular individual."[87] He noted the requirement that an individual be able to read and speak the English language, but also stated, "there is no requirement that States conduct an English proficiency test during the licensing process. FMCSA has reiterated in recent press inquiries that there is not currently any direct English-only licensing process."[88] Mr. Norris went on to cite the hearing standard provided in 49 C.F.R. § 391.41, and suggested that if the State doubted Mr. Dunn's medical qualifications, it could request that he be tested by a different doctor, or have his case reviewed by its medical board.[89] FMSCA left final determination as to Plaintiff's license to OMV's discretion.[90]

The State did not require Mr. Dunn to be tested by a different doctor or refer Mr. Dunn's application to its medical advisory board.[91]

Ms. Watson consulted with Major DeWayne White, who in turn consulted with State Police Wallace Davidson and Mark Morrison, all of the Louisiana State Police.[92] In her e-mail to Major White, Ms. Watson noted that Mr. Dunn "provided a medical audio form completed by his physician that passes federal guidelines; it is obvious that he cannot hear a forced whisper as required by Federal Regulations (see DVD); he also cannot clearly verbally communicate as required by Federal Regulations (see DVD)."[93]

Major White responded that he did not meet the qualifications to be issued a commercial driver's license "because he is incapable of speaking English, as required in 49CFR391."[94] Major White further noted that Mr. Dunn "failed to respond to questions asked of him by persons in close

---

[87] Exhibit 20, E-mail from William Norris to Kimberly Watson and Staci Hoyt, 9/5/10.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] Dunn Decl., Watson 79:5-18; Hoyt 58:13-59:6. Defendant's responses to Plaintiff's Interrogatories and Requests for Production contain no statements or documents showing a referral by OMV or DPS of Mr. Dunn's application to OMV's medical advisory board.
[92] DeWayne White is no longer employed by DPS.
[93] Exhibit 11.
[94] Exhibit 21, Email, 9/10/2010, from DeWayne White to Kimberly Watson

13

proximity to him in all likelihood due to his loss of hearing. It is our opinion the inspectors required

him to perform the "low air" test over again due to his lack of understanding the first time he

attempted to perform the test due to his inability to communicate and comprehend. With that said,

it is our collective opinion that Mr. Dunn should be denied a CDL because he fails to meet the

requirements in 391." *Id.* Major White noted that he had consulted with Wallace Davidson and Mark

Morrison in making this decision.[95] Major Wallace Davidson, who is now and was in 2010 in the

section of the state police that regulates vehicle size and weight, states that he did not see anything

on the tape that would involve his division, and he was not involved in the decision whether or not

to license Mr. Dunn.[96]  Major Mark Morrison is and was in 2010 in the Motor Carrier Section of the

State Police.[97] This section regulates commercial motor vehicles and enforces federal and state

regulations pertaining to motor carriers and commercial drivers.[98] Major Morrison testified that he

recalls watching the video, but does not recall being asked for an opinion, or having an opinion,

regarding Mr. Dunn.[99] He further testified that if an applicant can meet federal guidelines, he or she

should be allowed to obtain a CDL.[100]

  OMV employees involved in the final disposition on Mr. Dunn's case were concerned,

however, about Plaintiff's hearing impairment. Staci Hoyt testified, "I understand what's on his

medical [certification]. I also understand what's on the video [of Mr. Dunn's test]. . . . And they are

conflicting."[101] Ms. Hoyt made this determination despite not having seen the video; she testified she

only heard it from down the hall as other OMV employees watched it.[102] Ms. Hoyt believes that in

order to safely drive a commercial vehicle, a driver would "have to be able to hear train horns, any

---

[95] *Id.* Majors Davidson and Morrison were, in September 2010, Captains in their respective divisions of the State Police.
[96] Davidson 9:8-25; 10:10-13.
[97] Morrison 5:14-16.
[98] Morrison 5:21-6:1, 7:9-11.
[99] Morrison 16:10-12.
[100] Morrison 17:16-19.
[101] Hoyt 47:19-22.
[102] Hoyt 22:22-23:8.

type of horn that would prevent a public safety concern. You have to be able to communicate with law enforcement."[103] Again, Majors Davidson and Morrison assert that Mr. Dunn's impairments would not affect their ability to carry out their duties.[104]

Ms. Watson interprets the ability to hear a forced whisper as an "absolute requirement" under the federal regulations,[105] and the results shown on Mr. Dunn's medical certification "did not match up . . . with being able to hear a forced whisper."[106] Ms. Watson believed, based on her observation, that it would be unsafe for Mr. Dunn to drive, due to his hearing disability.[107]

Ms. Watson could not recall, and defendants have not produced, any record of inquiry made with Mr. Dunn or anyone else regarding how a deaf person might address their safety concerns.[108] In fact, however, at least one of the concerns OMV officials raised[109]—Mr. Dunn's ability to hear the low-air-pressure alarm during his pre-trip inspection—can be addressed through a non-auditory alarm. Cliff Langlois, OMV CDL consultant, and licensed commercial vehicle driver, testified that some trucks are equipped with visual, lighted alarms, rather than the audible alarm.[110] Plaintiff discussed another method of accommodating his disability in his deposition, a practice of inserting a soapy solution in an air hose to determine, based on the appearance of suds; this alerts the driver to any leaks in the hose without relying on sounds emitting from the hose.[111] Had OMV approached Plaintiff with actual concerns about his disability, in 2010 or later, Plaintiff would have willingly provided them with contact information for commercial drivers who are deaf and who have real-

[103] Hoyt 47:10-15.
[104] Davidson 9:8-25; Morrison 16:10-12, 17:16-19.
[105] Watson 50:24-51:3.
[106] Watson 50:15-18.
[107] Watson 86:23-87:6, 88:4-8.
[108] Watson 87:7-11, 88:13-18; Exhibit 22, Defendant's Responses to Plaintiff's Requests for Production of Documents, Request #10, and Exhibit 3 attached thereto, and Supplemental to Plaintiff's Requests for Production of Documents #10, and Exhibit B attached thereto.
[109] Watson 91:6-8; Hoyt 48:2-3.
[110] Langlois 21:23-25.
[111] Dunn 67:7-23.

world experience in managing a commercial vehicle as a hearing-impaired individual.[112] OMV officials did not do so.[113]

On September 13, 2010, Ms. Watson wrote a letter to Kacey Cox of Coastal, with a copy to Mr. Dunn. She stated, without elaboration, that Mr. Dunn did not meet the requirements of Federal Motor Carrier Safety regulations.[114] Ms. Hoyt and Ms. Watson testified that the decision finding Mr. Dunn to be unqualified was a collective one; Ms. Watson admitted producing the letter and stated she agreed with the decision it conveyed.[115] Following Ms. Watson's letter, Mr. Dunn attempted to contact Ms. Watson for clarification. On September 24, 2010, Mr. Dunn wrote Ms. Watson and asked, "Kim, why did you not answer my last question?"[116] Mr. Dunn states that Ms. Watson did not respond to his inquiries for further information.[117] Plaintiff requested through discovery production of all documents, records and recordings concerning plaintiff Bruce Dunn, including but not limited to . . . communications between plaintiff and the Louisiana Department of Public Safety and Corrections, the Office of Motor Vehicles. . . ." In its response to this request, Defendants produced no documents that can be construed as an answer to Mr. Dunn's request for more information from Ms. Watson.[118]

Following the filing of this complaint, Plaintiff took up residence in Florida in order to obtain a commercial driver's license there.[119] He attended school and passed the licensing exam, obtaining his Florida CDL in June 2012.[120] In December, Plaintiff went to his local OMV field office

---

[112] Dunn Decl.
[113] Dunn Decl.
[114] Exhibit 23, September 13, 2010 letter from Kimberly Watson to Kacey Cox.
[115] Hoyt 43:16-23, Watson 92:10-13.
[116] Exhibit 19, 9/24/10 e-mail from Bruce Dunn to Kimberly Watson
[117] Dunn 82:15-17.
[118] Exhibit 22.
[119] Dunn 88:18-25.
[120] Dunn Decl., Exhibit 24, Records pertaining to Mr. Dunn's training for and obtaining a CDL in the State of Florida.

and obtained a Louisiana CDL on the basis of his Florida license, thus bypassing the need to take a skills test in Louisiana.

In February 2012, the federal Department of Transportation issued a rule permitting the licensing of 40 individuals who had applied for waivers of the FMSCA hearing requirements.[121] Mr. Dunn did not and has not applied for such waiver because he meets the minimum hearing requirements established in 49 C.F.R. §391.41(11).

## IV. ENTITLEMENT TO JUDGMENT AS A MATTER OF LAW

**1.  Plaintiff's claims for declaratory and injunctive relief are not moot**

Plaintiff seeks a declaratory judgment and an injunction requiring DPS to make its licensing programs and activities accessible to people with hearing impairments.  Because of the discriminatory conduct of OMV officials during the licensing process, this program was inaccessible to Mr. Dunn. He was not permitted to use auxiliary aids or services that would have made communications during his skills tests accessible to him. OMV did not permit him retake the skills tests he failed, subjecting him to treatment different from license applicants without disabilities, and denying him opportunities that individuals without disabilities are routinely provided. In deposition testimony, OMV officials continue to maintain that modification to the testing process is not permissible, even if necessary to make the process accessible to individuals with disabilities. OMV has changed none of the underlying practices that led to the discriminatory conditions of Mr. Dunn's licensing; and though Mr. Dunn has managed to obtain a CDL, OMV has given no indication that, absent this lawsuit, it would refrain from taking adverse action against Mr. Dunn and attempt to revoke his license.

"[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," even in cases in which injunctive relief is

---

[121] Exhibit 25, Fed. Register Vol. 78, No. 22, 2/1/2013, pp. 7479-84.

sought. *Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) (parolee who was no longer required to register as a sex offender could seek injunctive relief in due process challenge to sex-offender registration requirement), *citing City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  The Supreme Court stated in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (reversing circuit court's holding that claim for civil penalties was mooted when the defendant, after commencement of the litigation, came into compliance with its Clean Water Act permit), that the standard for determining if a case has been mooted by a defendant's voluntary conduct is "stringent," and involves a showing that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

The party asserting mootness bears a "heavy burden" of showing that the allegedly wrongful behavior could not reasonably be expected to recur.  *Id.*, *see also Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009) *cert. granted in part*, 08-1438, 2010 WL 2025142 (U.S. May 24, 2010) (announced state-wide change in policy restricting prisoners on cell restrictions from attending religious services mooted claim).  For example, in *Sheely v. MRI Radiology Network*, 505 F. 3d 1173 (11th Cir. 2007), the court held that the party asserting mootness bears a "formidable," "heavy" burden that challenged conduct will not recur.  In that case, a blind individual was found entitled to seek injunctive relief against a radiology facility for denying access to her service animal, even though the clinic adopted a policy change permitting service animals after she filed suit.

Though Bruce Dunn has obtained a CDL essentially by doing an "end-around" OMV's discriminatory practices, OMV retains the authority to revoke his license. OMV has not shown that it has changed any of the practices that led to his unequal treatment, or that he will not be subjected to similar treatment in the future.  His case is not moot.

**2.  General prohibition on discrimination--Defendants have failed to make its licensing program accessible to individuals who have hearing impairments.**

**a. Defendants discriminated against Plaintiff on the basis of his hearing disability.**

Section 504 of the Rehabilitation Act of 1973, as amended, provides "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. §794(a).  Defendant has admitted receiving Federal financial assistance and the State of Louisiana budget published by the Louisiana Division of Administration show that DPS receives federal monies.[122] A qualified individual with a disability is one who meets the essential eligibility requirements for the services in question. 28 C.F.R. § 41.32.

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12165, provides at §12132 that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  "Public entities" include state governmental agencies like DPS.  42 U.S.C. §12115(1)(B).

A qualified individual with a disability is an individual who, with or without reasonable modifications rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2). Reasonable modifications are modifications to policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the

---

[122] Exhibit 26.

service, program, or activity. 28 C.F.R. § 35.130(b)(7). Auxiliary aids and services are defined to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12103(1)(A).

The rights and remedies of Title II of the ADA and those of the Rehabilitation Act are "almost entirely duplicative.  The only material difference between the two provisions lies in their respective causation requirements." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).   Generally, case law interpreting one statute as if it applies directly to the other.

### b. Plaintiff is otherwise qualified to obtain a commercial driver's license.

Mr. Dunn meets the essential eligibility requirements to hold a commercial driver's license. Defendants will likely assert that Mr. Dunn does not meet the eligibility requirement of 49 C.F.R. § 39.11(b)(2), which provides that a person is qualified to drive a motor vehicle if he/she can, among other qualifications, "read and speak the English language sufficiently to converse the with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." 49 C.F.R. § 39.11(b)(2). Mr. Dunn can perform the essential functions of this regulation. He can, indeed, speak English, though the ability of the listener to understand him might depend on that individual being attentive or accustomed to his speech patterns. He can communicate with hearing English-speakers through written notes, which he can both read and write. In this way he can respond to official inquiries, and both Mr. Davidson and Mr. Morrison testified that an individual who could do so presents no safety hazard.

Further, as William Norris of FMSCA pointed out to Ms. Watson and Ms. Hoyt, this regulation does not prohibit the State from licensing a non-English speaker, nor does regulation specify standards for establishing whether or not an individual meets the qualification. In this regard,

49 C.F.R. § 391.11 is in stark contrast to the regulations pertaining to medical qualifications of drivers, 49 C.F.R. § 391.41 *et seq.*, which provide detailed medical standards for the drivers, as well as protocols for the medical examination and qualifications for the medical examiner. Indeed, 49 C.F.R. § 391.11 places the burden on a motor carrier[123] to ensure that the driver in question meets the qualifications listed. Mr. Norris notes that some states take the position that the English-only requirement is an issue to be handled "roadside" by commercial vehicle enforcement ("CVE"), not by the State licensing divisions. That is, the state official who actually interacts with a person with limited English proficiency[124] can make the determination whether an individual meets the communication requirements.  The FMSCA officials left the determination of Mr. Dunn's qualification to the "discretion" of Louisiana's OMV, but this discretion cannot reasonably be interpreted to permit discrimination that is otherwise prohibited by federal law. Mr. Dunn's ability to physically voice words is impaired as a result of his hearing disability. When OMV refused to extend a modification of a regulation that, according to FMSCA, can be implemented with "discretion," is a violation of Title II of the ADA and § 504 of the Rehabilitation Act. Mr. Dunn, having met the essential requirements (age, physical ability, etc.) of a non-licensed commercial driver, was entitled to be provided with modifications or auxiliary aids in the administration of his examination.

**c. Defendants restricted Plaintiff's access to its licensing programs, discriminating against him on the basis of disability.**

It is not enough, under Title II of the ADA and § 504, for a governmental program to provide *some* access to individuals with disabilities.  Individuals with disabilities must be provided with "meaningful access" to the programs and services that are offered.  *Tennessee v. Lane*, 541 U.S. 509, 532-33 (2004); *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Henrietta D. v. Bloomburg*, 331 F.3d

---

[123] The Federal Motor Carrier Safety Act defines motor carrier as "a person providing motor vehicle transportation for compensation." 49 U.S.C. §§ 13501, 13102.

[124] The phrasing of the regulation—"speak the *English* language" implies that the emphasis is on the speaker's ability to communicate, which would be an issue with a person whose primary language is not English, rather than the physical ability to voice words.

261, 282 (2d Cir. 2003) (delays in receiving public assistance benefits denied "meaningful access");

*Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003) (physical barriers to accessible

seating, restrooms, and parking denied "meaningful access" to fair though wheelchair users were

able to attend), overruling on other grounds recognized by *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d

1159, 1167; *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (denial of sign language interpreter

denied "meaningful access" to prison programs though prisoner was able to physically attend); *Nat'l*

*Org. on Disability v. Tartaglione*, CIV. A. 01-1923, 2001 WL 1231717 (E.D. Pa. Oct. 11, 2001) (claimed

denial of right to vote in one's own neighborhood stated claim under the Rehabilitation Act, though

people in wheelchairs were provided with alternate means of accessing ballot).

Though Bruce Dunn was permitted to participate in two skills examinations, OMV

subjected him to discriminatory treatment in the provision of the skills examination, and

subsequently denied him the opportunity to retake his tests. Skills examinations are normally

conducted in the presence of only an examiner, who is not an OMV employee; on occasion, either

or both of the CDL consultants are present during the examination to observe the conduct of the

tester. In Mr. Dunn's case, OMV officials were present to observe him, not his tester, and sent four

staff members to participate. His examination was videotaped. He was forced to attempt to vocalize

his answers, though he knew it was unlikely that the observers could understand him. He was given

no information about why the additional personnel were there. Most importantly, OMV refused him

the opportunity to demonstrate his skills by allowing him to retake the test – despite the fact that

retests are routine for individuals who fail their skills examinations.

**3. ADA and Rehabilitation Act regulations—Defendant failed to provide auxiliary aids and services and reasonable modifications to Plaintiff.**

As noted above, "auxiliary aids and services" are defined statutorily to include qualified

interpreters *or other effective methods* of making aurally delivered materials available to individuals with

hearing impairments. 42 U.S.C. § 12103.[125] Section 504 regulations promulgated by the Federal Department of Transportation provide that recipients of federal financial assistance must take appropriate steps to ensure that communications with their applicants, employees, and beneficiaries are available to persons with impaired hearing. 49 C.F.R. § 27.7(c).

Both Clifton Langlois and Kimberly Watson testified that they did not attempt to adjust either their methods of communicating or the method of testing to account for Mr. Dunn's disability.[126] In fact, both testified that they refused to provide Mr. Dunn a test that was any different from the tests provided to others.

Contrary to Defendants' beliefs, the law requires DPS to make modifications to its regular procedures under some circumstances. Doing so in this case would have been easy and would not have undermined the quality of the test. Even if OMV refused to provide an interpreter, it could have easily arranged for testing instructions to be given in writing. OMV employees present at Mr. Dunn's test, none of whom he had previously met, could have written out their names and titles, so he understood who was there and why. Certainly, OMV could have allowed Mr. Dunn to, where necessary, write down the parts of the truck he was examining during the pre-trip inspection portion of the skills exam, and state in writing what he was checking for. Such modifications and aids would not have undermined the essential purpose of the test, which was to determine Mr. Dunn's familiarity with a commercial vehicle. Provisions of modifications or auxiliary aids would not have created an administrative or financial burden on OMV. They are well within the ambit of required modifications, and could have been easily provided. OMV did not permit such auxiliary aids or

---

[125] The current regulations, which took effect in March 2011, after at least a portion of the activity that forms the basis for this complaint, provides an expansive list of devices and services that may be considered auxiliary aids or services. The aid or service Mr. Dunn sough, written notes, was included in the previous regulatory definition in effect in 2010.
[126] Cited testimony from OMV employees demonstrates that OMV directed the course of the examination, which was actually scored by Mark Hawkins of Coastal. Regardless, ADA regulations prohibit DPS from discriminating either directly or through contractual, licensing, or other arrangements. 28 C.F.R. § 35.130. Thus, even if the discriminatory conditions of Mr. Dunn's skills test could be attributed to Coastal, OMV, as Coastal's licensor, present during the examination, bore responsibility for the way in which that test was conducted.

services, or allow reasonable modifications to its licensing program.

In written response to Interrogatories, defendants have cited 49 C.F.R. 383.383.133(c)(5), which provides that interpreters cannot be provided during skills tests, and that applicants must be able to understand and respond to verbal commands. The waiver of hearing requirements by FMSCA for some individuals indicates that this regulation, like the requirement that a commercial driver must be able to "speak the English language" should not be interpreted narrowly. The communications Ms. Berard received from Pearlie Robinson and other officials with FMSCA, a division of the Department of Transportation, which promulgated this regulation, indicated that written notes would be an acceptable method of testing Mr. Dunn.

Further, OMV's discriminatory conduct went beyond the administration of the test and their own communications during the test. OMV would not make accommodations for Mr. Dunn's disability in communicating prior to the test. Ms. Watson testified that Mr. Dunn could not hear her and she did not make an attempt to ensure he did; but she was not administering the test. Indeed, she is not qualified to do so as she does not hold a CDL. Finally, the modification Mr. Dunn principally needed was to be allowed to write his own answers, rather than receive written instructions from OMV or Coastal, and he was not permitted to do so.

**4. ADA and Rehabilitation Act regulations—Defendant discriminated by refusing to allow Plaintiff to retake the skills examination before his learner's permit expired, and by ultimately determining that he could not obtain a CDL.**

Both the ADA and the Rehabilitation Act prohibit DHH from discriminating directly or through contractual, licensing, or other arrangements on the basis of disability.  28 C.F.R. §35.130(b)(1), 49 C.F.R. § 27.7(b). In providing aids, benefits, and services, public entities must not deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; afford an opportunity to participate in or benefit from the aid, benefit, or service

24

that is not equal to that afforded others; or provide an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. 28 C.F.R. § 35.130(b)(1)(i)-(iii).

OMV subjected Mr. Dunn to highly unusual testing conditions, which resulted in him feeling "overwhelmed," "nervous," and "deflated."[127] In so doing, OMV subjected Mr. Dunn to unequal aids, benefits, and services in administering its licensing program. 28 C.F.R. § 35.130(b)(1)(ii). OMV refused to permit reasonable modifications to its testing procedures, or to provide Mr. Dunn with obviously needed auxiliary aids and services. These omissions constitute violations of the law in and of themselves, but they also resulted in a skills examination that did not afford Mr. Dunn an equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided to licensees who can hear. 28 C.F.R. § 35.130(b)(1)(iii).

Finally, OMV placed Mr. Dunn's CDL application "under review" for the duration of the validity of his learner's permit and, with the exception of one re-test, refused to allow him to retake the skills test he had failed. Any other prospective CDL licensee may retake the skills test as many times as can be scheduled before his learner's permit expires. Coincident almost to the day with the expiration of his learner's permit, OMV wrote Mr. Dunn and informed him that he is not qualified to hold a CDL, without further explanation.

**5. Permitting Bruce Dunn to obtain a CDL does not impose a direct threat to the health and safety of others.**

While OMV raised the issue of Mr. Dunn's ability to speak English as a reason for denying him this license, it is clear his hearing disability was the motivating reason for denying him the license. FMSCA officials, who oversee OMV's application of its regulations, declined to tell OMV that Mr. Dunn should not be licensed. FMSCA officials did distinguish the "English-speaking"

---

[127] Dunn 50:1, 9.

requirement from other licensing decisions and left the matter to OMV's discretion. In exercising

this discretion, however, OMV ran afoul of federal laws that protect individuals with disabilities

from discrimination.

Believing the results of Mr. Dunn's hearing test to be inaccurate and believing that Mr.

Dunn could not, due to his impairment safely drive a truck, OMV officials rested comfortably with

their own uninformed opinions. OMV could have submitted Mr. Dunn's application to its medical

review panel, or asked Mr. Dunn to have another practitioner test his hearing. Likewise, OMV relied

on suspicions about potential hazards that could result from licensing a hearing-impaired driver.

This is not permissible. OMV may under some circumstances exclude individuals who, due to their

disabilities, pose a direct threat to the health or safety of others, but such circumstances are

construed narrowly. Because few activities are risk free, the Rehabilitation Act and the ADA compel

OMV to ask whether the supposed risk Mr. Dunn posed is significant. *Bragdon v. Abbott*, 524 U.S.

624, 649 (1998); *School Bd. of Naussau Cty. V. Arline*, 480 U.S. 273, 287 (1987).

Further, risk assessment must be based on medical or other objective evidence. *Bragdon*, 524

U.S. at 649, *citing Arline*, 480 U.S. at 288. ADA regulations provide that in determining whether an

individual poses a direct threat, a public entity must make an individualized assessment, based on

reasonable judgment that relies on current medical knowledge or on the best available objective

evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential

injury will actually occur; and whether reasonable modifications of policies, practices, or procedures

or the provision of auxiliary aids or services will mitigate the risk. 28 C.F.R. § 35.139(b).[128]

---

[128] The Department of Justice promulgated revised ADA regulations on September 10, 2010, the date of Kim Watson's letter to Mr. Dunn informing him that he is not qualified to hold a CDL. These regulations took effect on March 15, 2011, prior to Mr. Dunn's renewed contact with OMV, requesting that he be allowed to retake his licensing exam. Furthermore, in specifying the nature of the inquiry that must be undertaken, the Department codified already existing interpretations of the law, as cited above.

The Supreme Court found an individualized inquiry "essential" in order to achieve the stated goal of § 504 and, later, the ADA, of protecting individuals with disabilities from "deprivations based on prejudice, stereotypes, or unfounded fear," while allowing that in some specific situations an individual's specific disability may pose significant risk. *Arline*, 480 U.S. at 288. The Fifth Circuit found in an ADA Title I employment case that an individualized assessment of a person's ability to safely perform the functions of a job is required in determining the existences of a direct threat. *Kapche v. City of San Antonio*, 176 F.3d 840, 844 (5th Cir. 1999); *Kapche v. City of San Antonio*, 304 F.3d 493, 497-98.

Other circuits have elaborated on the individualized inquiry in the application of § 504 and Title II of the ADA. In *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999), the Ninth Circuit considered whether a city's zoning ordinance that would result in closure of methadone clinics was permissible under § 504 and the ADA. Citing the Department of Justice's Technical Assistance Manual, the court concluded that (1) a direct threat that can be mitigated by provision of reasonable accommodation or auxiliary aids and services cannot be grounds for exclusion; and (2) a public entity's determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability. *Id.* at 737*, citing* Department of Justice Americans with Disabilities Act Title II Technical Assistance Manual § II-2.8000. In assessing risk, it is not enough that an individual pose a hypothetical or presumed risk. *Bay Area Addiction Research and Treatment*, 179 F.3d at 737. The evidence must establish that an individual does, in fact, pose significant, serious risk. *Id.* Other courts have adopted the Ninth Circuit's Bay Area analysis of direct threat. *See, e.g., MX group v. City of Covington*, 293 F.3d 326, 344-45 (6th Cir. 2002); *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 303-304 (3rd Cir. 2007). The Seventh Circuit has established a four-part test: (1) duration

of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm

will occur; and (4) the imminence of potential harm. *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir.

2004).

      Courts have placed the burden of demonstrating a direct threat that cannot be mitigated

through accommodation with the entity denying the individual. *Branham v. Snow*, 392 F.3d at 905-07

(7th Cir. 2004) ("It is the employer's burden to show that an employee posed a direct threat to

workplace safety that could not be eliminated by reasonable accommodation"); *U.S. EEOC v. AIC

Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283-84 (7th Cir. 1995).

      OMV made no such inquiries with respect to Mr. Dunn. Testimony from Staci Hoyt and

Kimberly Watson indicate both that they believed that Mr. Dunn's medical certification was

inaccurate, and that he could not safely drive a truck. An e-mail from State Police Maj. DeWayne

White shows that State Police made determinations based on observing Mr. Dunn's test, taken

without accommodation or auxiliary aid, and under circumstances that were stressful to him, that he

could not hear, and therefore was not qualified to drive a truck.

      The federal regulations provide the standards a driver must meet in order to drive a

commercial vehicle. Assessment of any risk posed should have been made within the context of

these regulations, not based on speculation about whether Mr. Dunn's ability to hear a horn, or

passing notes instead of conversing on the side of the road would present risk. The federal hearing

standards, permitting an individual to use hearing aids in order to achieve the requisite levels

anticipate hearing loss and make no further accounting necessary. Nonetheless, if Defendants had

specific concerns about Mr. Dunn, it was obliged to consider whether modifications or aids could

mitigate any potential risk. Defendants failed to do so. DPS never asked Mr. Dunn how he intended

to handle the situations they believed to be risky, and instead made an ill-informed assessment based

on stereotype and generalization, that he was incapable of safely driving a truck. Had they done so, Mr. Dunn could have answered questions about their concerns, and provided them with contact information for individuals he knows who are deaf and who have been safely driving commercial vehicles for years.

As previously noted, the Department of Transportation Federal Motor Carrier Safety Administration has granted forty individuals exemptions, valid for an initial two-year period, to the hearing requirement prescribed at 49 C.F.R. § 391.41(11). In granting the exemption, FMSCA stated, "There is no specific scientific data to show that the hearing impaired drivers are a higher safety risk than other drivers."[129]

5.   **Defendant knowingly and intentionally failed to address the inaccessibility of its facilities and programs, resulting in compensable damages to Plaintiff.**

Plaintiff has shown that OMV was aware that it was subjecting Mr. Dunn to discriminatory treatment, yet refused to alter its conduct. Plaintiff is thus entitled to compensable damages.

In *Delano-Pyle v. Victoria County*, 302 F.3d 567 (5th Cir. 2002), the Fifth Circuit held that the standard for recovery of damages under § 504 of the Rehabilitation Act is that of intentional discrimination, recognizing that the clear intent of Congress was "to impose on policy-makers the affirmative duty to create policies or procedures to prevent discrimination based on disability." That case involved a police officer who continued to try to communicate verbally with a deaf arrestee, rather than to assure that his communications with the arrestee were effective, was found to have intentionally discriminated on the basis of disability.

Numerous courts have held that a showing of intentional discrimination based on disability is not premised on a showing of ill-will or animosity toward a particular plaintiff. "Rather, intentional discrimination may be inferred when a 'policymaker acted with at least deliberate

---

[129] Exhibit 25

indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy ... [or] custom.'" *Bartlett v. New York State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998), citing *Ferguson v. City of Phoenix*, 931 F.Supp. 688, 697 (D.Ariz.1996), *aff'd and remanded*, 157 F.3d 668 (9th Cir. 1998), *cert. denied*, 526 U.S. 1159 (1999); and *Canton v. Harris*, 489 U.S. 378 (1989).

As another court described it: "The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that ... likelihood.'" [1] *Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222 (10th Cir. 2009), *citing Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001), *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147 (10th Cir. 1999), and *Canton, supra.*

Similarly, in *Bartlett, supra*, the New York Board of Law Examiners' implementation of a policy of denying accommodations to applicants with certain standardized test scores was found to constitute deliberate indifference to the plaintiff's federally protected rights. In *Benavides v. Laredo Medical Center*, 2009 WL 1755004 (S.D.Tex. 2009). the plaintiff's claim that a hospital lacked a policy to accommodate individuals with hearing disabilities by ensuring the availability of sign-language interpreter services was found sufficient to state a claim for compensatory damages.  And in *Panzardi-Santiago v. University of Puerto Rico*, 200 F.Supp.2d 1 (D. Puerto Rico 2002), the defendant university's motion to dismiss a claim for compensatory damages under the Rehabilitation Act was denied in case alleging architectural barriers.  The court there held that issues of fact existed as to defendants' awareness of plaintiff's disability and maintenance of inaccessible facilities thereafter.

The actions of DPS officials bear similarity to those of the police officers in *Delano-Pyle*, the controlling Fifth Circuit case on intentional discrimination under the Rehabilitation Act. DPS officials knew that Mr. Dunn could not hear them during the administration of his skills test. They

knew that they could not understand Mr. Dunn as he was forced to attempt to verbalize his answers during the skills test, yet made no allowances to ensure that he was able to communicate his knowledge effectively. OMV officials that knew the conditions of Mr. Dunn's test were highly unusual, due to the presence of four OMV observers in addition to the examiner, one of whom videotaped Mr. Dunn as he attempted to take the examination. Finally, OMV officials knew that Mr. Dunn had produced a medical certificate showing that he met the applicable hearing standards. The OMV officials involved are not audiologists, yet on the basis of their own preconceptions, they determined that Mr. Dunn's certificate was incorrect and not even in need of outside verification by another professional. In short, OMV officials were aware that the actions they took toward Mr. Dunn not only failed to account for his disability, but actively penalized him for it.

6. **This Court should enjoin Defendant to take the action necessary to make its licensing program accessible to individuals with disabilities, and to refrain from taking adverse action against Plaintiff's license on the basis of matters at issue in this suit.**

The injunctive relief that Plaintiff seeks in this case is to require that Defendants ensure that its programs are accessible to the Plaintiff and others with hearing impairments. Plaintiff has obtained his license, but did so through a "back door," without the knowledge of OMV officials who have the authority to revoke his license. Defendants continue to maintain that Plaintiff is not qualified to hold a commercial driver's license; thus they must be enjoined from engaging in further adverse action toward Plaintiff on the basis of his disability and in violation of the ADA and the Rehabilitation Act. These steps are neither difficult nor onerous, and they are necessary to afford Plaintiff meaningful access to Defendants' program.

Date: September 13, 2013

Respectfully submitted,

_____s/ Susan Meyers_____

Susan Meyers, La. Bar No. 29346
Advocacy Center
1010 Common Street, Suite 2600
New Orleans, Louisiana 70112
Telephone: 504-522-2337, ext. 138
Facsimile: 504-522-5507
smeyers@advocacyla.org

Nell Hahn, La. Bar No. 22406
Advocacy Center
600 Jefferson St., Suite 812
Lafayette, LA 70501
Telephone:  337-237-7380, ext. 11
Facsimile:  337-237-0486
nhahn@advocacyla.org
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2013, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

_____s/ Susan M. Meyers_____

Susan M. Meyers, T.A., La. Bar No. 29346
Advocacy Center
1010 Common Street, Suite 2600
New Orleans, Louisiana 70112
Telephone: 504-522-2337, ext. 138
Facsimile: 504-522-5507
smeyers@advocacyla.org