UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

BRUCE DUNN

CIVIL ACTION

VERSUS

NO. 11-495-JJB-RLB

LOUISIANA DEPARTMENT OF PUBLIC
SAFETY & CORRECTIONS, ET AL.

### RULING ON MOTION FOR SUMMARY JUDGMENT

This matter is before the court on the Plaintiff Bruce Dunn's Motion (doc. 44) for Summary Judgment. The Defendants James M. Leblanc and the Louisiana Department of Public Safety & Corrections have opposed the motion. (Doc. 62). Jurisdiction is based on 28 U.S.C. § 1331. The Court conducted oral argument on December 20, 2013. For the reasons provided herein, the Court **GRANTS IN PART AND DENIES IN PART** the Plaintiff Bruce Dunn's Motion (doc. 44) for Summary Judgment.

### Background

This case concerns the alleged discrimination perpetrated upon Mr. Bruce Dunn. Mr. Dunn has a hearing impairment, and as a result, he wears a hearing aid that amplifies his ability to detect sounds. Nevertheless, "he generally cannot understand spoken language." (Doc. 44-2, p. 4, ¶ 20). "His primary spoken language is American Sign Language."(Doc. 44-2, p. 4, ¶ 18).

In 2010, Mr. Dunn attempted to obtain a Louisiana commercial driver's license (CDL). "The Louisiana Department of Public Safety (DPS), through its subdivision [the Louisiana Office of Motor Vehicles (OMV)], issues driver's licenses, including commercial driver's licenses, in the State of Louisiana." (Doc. 44-2, p. 1, ¶ 1). Initially, the individual must satisfy certain federal- and state-required physical requirements, including those implemented pursuant to the Federal Motor Carrier Safety Administration Regulations and Louisiana state licensing

1

requirements. The Federal Motor Carrier Safety Regulations (FMCSR) "provide much of the substantive and procedural law applicable to the licensing and regulation of Commercial Motor Vehicles and their operators." (Doc. 62, p. 2). These include minimum hearing standards, which require an individual applying for a CDL to have the ability to:

> First perceive[] a forced whisper voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard . . . .

49 C.F.R. § 391.41(11). Previously, in September 2009, Mr. Dunn obtained a medical certification that showed, when tested with an audiometric device, he could hear with an average of 40 decibels or above in both ears, which would satisfy the federal- and state-required physical requirements provided under 49 C.F.R. § 391.41.

If the individual satisfies these mandated physical requirements, the individual must then complete additional skill and knowledge testing. "After successfully passing a written test, a prospective commercial driver receives a CDL learner's permit and is eligible to receive practical, on-the-road training from a school." (Doc. 44-2, p. 1, ¶ 4). "Once trained, the prospective commercial driver takes a skills test, which consists of three parts." (Doc. 44-2, p. 2, ¶ 5). "The first part of the test is the pre-trip inspection, during which the prospective commercial driver points out various parts of the truck that need to be examined prior to driving, and explains what he is checking and why." *Id.* "The second portion is the back-up test, during which the student must demonstrate the ability to maneuver the truck in reverse." *Id.* "The third portion of the skills test is the on-the-road test, during which the test-taker drives the truck in traffic, accompanied by the tester." *Id.* Generally, the Louisiana Office of Motor Vehicles (OMV) contracts with third-party entities to administer the skills portion of the CDL examination. (Doc.

44-2, p. 2, ¶ 6; doc. 44-4, p. 1). Nonetheless, the third-party testers must administer the testing according to Louisiana guidelines "and are subject to audit and observation by OMV in the administration of the skills test." (Doc. 44-2 p. 2, ¶ 7).

"An individual may not take a skills test unless he has a valid CDL learner's permit." (Doc. 44-4, p. 2, ¶ 9). A CDL learner's permit is valid for a six-month period, unless it has been extended. During the validity of the CDL learner's permit, a prospective driver that fails the skills portion of the CDL examination may retake that portion. "There is no limit on the number of times a driver can retake the skills exam while his learner's permit is valid." (Doc. 44-2, p. 3, ¶ 10).

After completing coursework at Coastal Truck Driving School ("Coastal") and receiving his CDL learner's permit, Mr. Dunn attempted to pass the skills portion in order to obtain his CDL. A skills test was conducted on July 16, 2010. During the skills test, five individuals were present and watched the duration of the testing—four OMV employees and the examiner. Normally, only two individuals would be present during the skills test. Furthermore, Mr. Dunn's test was being videotaped, which was an unusual occurrence based on past precedent.

During the pre-inspection portion of the test, Mr. Dunn was not allowed to write his answers. Instead, he was forced to gesture to parts of the truck and attempt to vocalize his answers. The OMV did not modify any of the testing procedures for Mr. Dunn. Because he was allegedly overwhelmed and nervous, Mr. Dunn failed the pre-trip inspection portion of the skills test. Undeterred, Mr. Dunn scheduled a second test on July 28, 2010. At this test, there were only three individuals present and Mr. Dunn took the backing-up portion of the skills test. Again, Mr. Dunn failed.

As mentioned above, there is generally no limit on the number of times an individual can retake the skills test, provided that his CDL learner's permit is valid. The only limitation is that an applicant must wait 48 hours between failing the test and re-taking it. Nevertheless, after Mr. Dunn's second failure, OMV began to review Mr. Dunn's case. Between July 28, 2010 and September 13, 2010, the OMV conducted a review of Mr. Dunn's application for a license, which involved sending a DVD of the video to various Department of Public Safety personnel and individuals at the Federal Motor Carrier Safety Administration. During this time, Mr. Dunn was not permitted to retake the examination. Mr. Dunn's CDL learner's permit expired prior to the completion of the review.

On September 13, 2010, Ms. Kim Watson—manager of the Driver's License section of the OMV—emailed Kacey Cox—a Coastal employee—and informed her that Mr. Dunn did not meet the requirements of the FMCSR, without elaboration. Mr. Dunn attempted to obtain the reasoning for this decision, but he contends that none was ever provided to him.

As a result of the foregoing, the plaintiff filed the present lawsuit, claiming that the defendants discriminated against him as a result of his hearing disability, in violation of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973. He filed suit against the OMV and James M. LeBlanc, the Secretary of the Louisiana Department of Public Safety. In the suit, Mr. Dunn seeks a declaratory judgment, injunctive relief, and monetary damages. Plaintiff seeks injunctive relief, barring the OMV from taking adverse action with respect to his current CDL and forcing OMV to institute "a policy of providing individuals with hearing impairments the necessary auxiliary aids and services or reasonable modifications

necessary."[1] (Doc. 44, p. 2). Subsequently, the plaintiff filed the pending motion for summary judgment.

**Analysis**

1.  <u>Summary Judgment Standard</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. P. 56(a). The movant must demonstrate that there is no genuine issue of material fact for trial. When the non-moving party has the burden of proof at trial, the movant need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party can do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although the court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139–40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not . . . competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991).

---

[1] It must also be mentioned that subsequent to filing his complaint, Mr. Dunn took up residence in Florida to obtain a CDL. He was able to obtain a Florida CDL in June 2012, and in December 2012, he went to a Louisiana OMV field office and obtained a Louisiana CDL on the basis of his Florida license, thus bypassing the need to take a skills test in Louisiana.

"In a motion for summary judgment, a federal district court is not called upon to make credibility assessments of conflicting evidence." *Melancon v. Ascension Parish*, 823 F. Supp. 401, 404 n.19 (M.D. La. 1993). "To the contrary, all evidence is considered in the light most favorable to the non-movant." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (quoting *Anderson*, 477 U.S. at 255).

2.   Satisfaction of Preliminary Requirements for CDL

For purposes of this suit, the plaintiff brought the action under the ADA and the Rehabilitation Act. In a prior ruling, the Fifth Circuit looked at the interrelationship between the ADA and the Rehabilitation Act:

> The ADA is a federal anti-discrimination statute designed "[t]o provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." The RA [Rehabilitation Act] was enacted "to ensure that handicapped individuals are not denied jobs or other benefits because of prejudiced attitudes or ignorance of others." The language in the ADA generally tracks the language set forth in the RA. In fact, the ADA expressly provides that "[t]he remedies, procedures and rights" available under the RA are also accessible under the ADA. Thus, "[j]urisprudence interpreting either section is applicable to both." A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination.

*Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (internal citations omitted). Accordingly, "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citing *Pace v. Bogalusa City School Bd.*, 403 F.3d 272, 287–88 (5th Cir. 2005)). "The only material difference between the two provisions lies in their respective causation requirements." *Id.* (citing *Pace*, 403 F.3d at

288). "Section 504 of the Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .'" *Id.* (citing 29 U.S.C. § 794(a)). "By contrast, under Title II of the ADA, 'discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff.'" *Id.* (citing *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002)). The parties have not argued why this Court should interpret Title II or Section 504 differently in this case. Accordingly, while our analysis will be informed by both Title II and Section 504, our holding applies to both statutes. *See Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011).

Title 2 of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To state a claim under Title II, a plaintiff must allege '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.'" *Garrett v. Thaler*, 2014 WL 1282619, at *6 (5th Cir. Apr. 1, 2014) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011)). Under Title II, "[t]he term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42

7

U.S.C. § 12131. There is no contention that Mr. Dunn does not have a "disability," and thus, the

Court will provide no further analysis on that issue. Instead, it will focus the analysis on whether

Mr. Dunn was a "qualified individual with a disability."

In their opposition to the motion, the defendants contend that Mr. Dunn did not satisfy

the preliminary qualifications/essential functions to obtain a CDL. First, the defendants assert

that Mr. Dunn failed to satisfy the general qualification under 49 C.F.R. § 391.11(b)(2), which

provides that a CDL driver must be able to:

> [R]ead and speak the English language sufficiently to converse with the general
> public, to understand highway traffic signs and signals in the English language, to
> respond to official inquiries, and to make entries on reports and records.

In addition, the defendants contend that Mr. Dunn did not satisfy the physical qualifications for

CDL drivers, specifically the requirement that provides:

> (b) A person is physically qualified to drive a commercial motor vehicle if that
>     person—
>       (11) First perceives a forced whispered voice in the better ear at not less
>             than 5 feet with or without the use of a hearing aid or, if tested by use
>             of an audiometric device, does not have an average hearing loss in the
>             better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz
>             with or without a hearing aid when the audiometric device is
>             calibrated to American National Standard . . . .

49 C.F.R. § 391.41(b)(11).

The defendants go on to assert that the FMCSR requires the applicant to communicate

verbally during the CDL testing. The defendants point out that 49 C.F.R. § 383.113(a)(2)(i)

requires a CDL applicant to "[l]ocate and verbally identify air brake operating controls and

monitoring devices." Furthermore, with respect to the use of interpreters during the skills portion

of the CDL test, 49 C.F.R. § 383.133(c)(5) provides that:

> Interpreters are prohibited during the administration of skills tests. Applicants
> must be able to understand and respond to verbal commands and instructions in

8

English by a skills test examiner. Neither the applicant nor the examiner may communicate in a language other than English during the skills test.

As a result of these provisions, the defendants contend that the FMCSR anticipates and requires the applicant to communicate verbally during the administration of the CDL skills test. Because Mr. Dunn could not communicate verbally, the defendants contend that he did not meet the basic qualifications to obtain a CDL, and thus, summary judgment is improper.

Nevertheless, the plaintiff opposes these contentions. The plaintiff argues initially that he satisfied the requirements under 49 C.F.R. § 391.11(b)(2), because "speak" does not refer to the physical ability to speak, but rather, it refers to the ability to communicate in English. Mr. Dunn contends that he can communicate in English as required by the regulations. Furthermore, the plaintiff alleges that he met the hearing requirements pursuant to 49 C.F.R. § 391.41(b)(11), because the provision only requires the applicant to either be able to hear a "forced whisper" at not less than 5 feet or to satisfy the specific hearing requirements if tested by use of an audiometric device.

Turning first to the hearing requirements, the Court finds there is no genuine issue of material fact that plaintiff satisfied the hearing requirement at the time of testing in 2010. Under 49 C.F.R. § 391.41(b)(11), the applicant must either be able to "perceive[] a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid **or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid** when the audiometric device is calibrated to American National Standard." 49 C.F.R. § 391.41(b)(11) (emphasis added). The plaintiff presents the original medical examination report from September 2009, wherein Mr. Dunn had an average hearing loss in his better ear of exactly 40 decibels. (Doc. 50-2, p. 3). Further, the plaintiff presents additional medical examination

reports from 2010 and 2012, and these reports all show that plaintiff satisfied the requirement that an applicant must "not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid." *Id.*

In opposition, the defendants assert that Mr. Dunn could not satisfy the "forced whisper" test. (Doc. 62, p. 6). Nonetheless, under the regulations, an individual does not need to satisfy the "forced whisper" test if he satisfies the audiometric device test, as it is an alternative proposition. The defendants do present the expert report of Dr. Jack Breaux in support of the proposition that Mr. Dunn did not satisfy the audiometric test requirement. In his letter dated July 22, 2013, Dr. Breaux provides that even with a hearing aid, Mr. Dunn's average hearing loss was approximately 50 decibels, which would not satisfy the requirements. (Doc. 51-1, p. 30). Nonetheless, Dr. Breaux does provide that "[i]t is possible that with greater amplification through adjustment to the current hearing aid or with a more powerful hearing aid, that the minimum hearing at 40 decibels could be obtained." *Id.* Furthermore, this test was administered on July 19, 2013, and Dr. Breaux only provides that Mr. Dunn failed to meet the requirements on the date of the examination. *See* Doc. 51-1, p. 30–31. This test—conducted almost three years after the relevant events—does not establish a genuine issue of material fact regarding whether plaintiff met the hearing requirements as of the date he applied for a CDL. Specifically, the plaintiff has presented uncontroverted test results from 2009 and 2010 that show he satisfied the audiometric testing requirement as of the time he was allegedly discriminated against by the OMV. Accordingly, the Court finds no genuine issue of material fact regarding whether plaintiff satisfied the hearing requirement at the time of the alleged discrimination.

Next, the Court will turn its attention to the requirement that an applicant must be able to "read and speak the English language sufficiently." After review, this Court finds that the

requirement refers to the ability to communication in English, as opposed to the physical ability to speak. The Court finds as such for three reasons. First, the requirement is listed in 49 C.F.R. § 391.11(b)(2). In subsection (b)(4) of Section 391.11, an applicant is required to be "**physically** qualified to drive . . . in accordance with subpart E." 49 C.F.R. § 391.11(b)(4) (emphasis added). Subpart E delineates the physical qualifications to hold a commercial driver's license, which includes the hearing requirement discussed above. *See* 49 C.F.R. § 391.41. The list of physical qualifications does not contain any requirement that an individual must be able to vocalize English. The evidence shows that Mr. Dunn can communicate in English, predominantly through written communication. While he may not have the ability to vocalize clearly, he still has the ability to communicate in English through other means.

Further, in February 2013, the Federal Motor Carrier Safety Administration granted exemptions to 40 individuals who did not satisfy "the Agency's physical qualifications standard concerning hearing for interstate drivers." 78 FR 7479-01. These individuals were granted a two-year exemption despite the fact that they could not meet the requisite hearing requirements. *See id.* The regulation refers to the National Association of the Deaf's (NAD) contention that "communication in trucking is no longer hampered by hearing loss because drivers increasingly rely on smartphones and other technology to communicate with dispatch." *Id.* Further, the regulation does not acknowledge or even reference as a barrier to obtaining a CDL that these individuals presumably have the same difficulty in vocalizing English as Mr. Dunn.

Finally, in this case, a representative with the Department of Transportation and FMCSA corresponded in email that "the driver [Mr. Dunn] could satisfy the communication aspect of the pre-trip inspection and air brake skills by communicating and explaining **in writing** during the tests as long as nothing is prewritten." (Doc. 46-1, p. 102) (emphasis added). This is despite the

fact that the regulations specifically state that a CDL applicant must "[l]ocate and verbally identify air brake operating controls and monitoring devices." 49 C.F.R. § 383.113(a)(2)(i). Thus, even though the regulations specifically require the applicant to "verbally identify," it appears that the U.S. Department of Transportation allows an individual to use written communications, as opposed to being forced to actually vocalize the requisite information.

Therefore, based on the foregoing, the Court finds that the requirement that an applicant must be able to "speak the English language," does not require actual vocalization, but rather, the ability to communicate in English. Based on the evidence presented, there is no genuine issue of material fact that Mr. Dunn can communicate in English, specifically through written language. Further, the Court finds no genuine issue of material fact indicating that Mr. Dunn did not meet the hearing requirement as of 2010, because the uncontroverted evidence shows that Mr. Dunn passed the audiometric device test in 2009, 2010, and 2012. Therefore, the Court finds there is no genuine issue of material fact that—in 2010—Mr. Dunn satisfied these preliminary requirements necessary to obtain a CDL, and therefore, is a qualified individual with a disability.

3. Discrimination Under ADA / Rehabilitation Act

As this Court finds no genuine issue of material fact that Mr. Dunn is an otherwise qualified individual with a disability, the Court must now determine whether the defendants discriminated against him through their actions. "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A 'public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government," which would include the Louisiana Department of Public Safety and Corrections.

12

Through "[r]ecognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (citing 42 U.S.C. § 12131(2)). "Title II imposes an obligation on public entities to make reasonable accommodations or modifications for disabled persons . . . ." *Garrett*, 2014 WL 1282619, at *6 (citing *Lane*, 541 U.S. at 531). "But Title II does not require States to employ any and all means to make . . . services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs." *Tennessee*, 541 U.S. at 531–32. "It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service." *Id.* at 532. When looking at Section 504 of the Rehabilitation Act, the Supreme Court in *Alexander v. Choate* stated:

> [O]therwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

469 U.S. 287, 301 (1985).

The plaintiff first claims that the defendants refused to allow him to write his answers during his skills test, specifically in relation to the pre-trip inspection portion of the skills test. Based on the evidence presented, the Court finds that allowing the plaintiff to write his answers to the pre-trip inspection portion of the examination would have been a "reasonable accommodation," which the defendants failed to provide. Allowing the plaintiff to write his answers would not have amounted to a lowering of the safety standards, as the defendants contend. This is buttressed by the recent exemptions by the FMCSA for individuals who did not

satisfy "the Agency's physical qualifications standard concerning hearing for interstate drivers," which presumably would have the same verbal communication problems as Mr. Dunn. 78 FR 7479-01. Even the representative from the Department of Transportation and FMCSA confirmed in an email that Mr. Dunn "could satisfy the communication aspect of the pre-trip inspection and air brake skills by communication and explaining **in writing** during the tests as long as nothing is prewritten." (Doc. 46-1, p. 102). Nevertheless, the defendants refused to allow Mr. Dunn to write his answers. The defendants point to 49 C.F.R. § 383.113(a)(2)(i), which requires a CDL applicant to "[l]ocate and verbally identify air brake operating controls and monitoring devices." However, despite this provision, the representative with the Department of Transportation and FMCSA still provided that Mr. Dunn could satisfy the requirements by writing his answers. Accordingly, there is no genuine issue of material fact that the defendants refused to allow Mr. Dunn to write his answers, and the Court finds that this would be a "reasonable accommodation." Therefore, judgment must be entered in the plaintiff's favor as to his claim of discrimination related to the defendants' refusal to allow him to write his answers.

The defendants claim that allowing Mr. Dunn to write his answers would pose a "risk to the health and safety of others," as it "would require a lowering of existing safety regulations concerning the operation of commercial vehicles." Doc. 62, p. 8). The Court finds this argument misguided. Allowing Mr. Dunn to write his answers would not pose a risk to health and safety of others. In support of the argument, the defendants cite to the *Kapche v. Santonio* case. 176 F.3d 840, 844 (5th Cir. 1999). However, the defendants cite to this case for the legal proposition that a defendant need not institute a proposed modification if the individual poses a "direct threat" to the safety of others. However, the facts of that case are dissimilar to the one presently before this Court, and further, the evidence in front of this Court actually leads to the opposite conclusion—

14

that an individual in a similar situation to Mr. Dunn does not pose a "direct threat" to the health and safety of others. *See* 78 FR 7479-01.

Nevertheless, the Court also finds that the plaintiff cannot prevail as a matter of law regarding his claims that the following conduct also constituted discrimination: (1) additional people were present at his testing; (2) his testing was videotaped; and (3) the plaintiff's application was put under review, and the review was not completed until after his CDL learner's permit expired. The law cited by the plaintiff does not support a legal finding that the defendants' actions in having three additional people present at the testing and videotaping the plaintiff's testing should constitute discrimination. Furthermore, while it is unfortunate that the review process lasted until after Mr. Dunn's learner's permit expired, this appears to be a good-faith review process to determine whether Mr. Dunn was qualified. (*See* Doc. 51-1, p. 102–106; doc. 52-1, p. 29–38). The law cited by the plaintiff does not convince this Court that these actions would constitute discrimination under the ADA or Rehabilitation Act. While the Court does not agree with the defendants' ultimate determination, it also refuses to find that these seemingly good-faith review efforts rise to the level of discrimination. Accordingly, the Court refuses to grant the plaintiff summary judgment as to these claims.

Accordingly, based on the foregoing, the plaintiff is entitled to summary judgment as to his claim that the defendants discriminated against him, in violation of the ADA and Rehabilitation Act, due to the defendants' refusal to allow the plaintiff to write his answers during his skills testing. Therefore, the plaintiff is entitled to summary judgment as a matter of law as to this claim.

4.  <u>Intentional Discrimination</u>

In addition to seeking a declaratory judgment that the defendants violated the ADA and Rehabilitation Act, the plaintiff also seeks compensatory damages, in an amount to be determined at trial. "A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 574. The Fifth Circuit does not appear to have adopted the "deliberate indifference" standard that the plaintiff argues for in his motion. *Id.* at 575 ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA. However, in order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination."). Instead, the Fifth Circuit requires a showing of intentional discrimination. *Id.* Therefore, the law from other circuits regarding "deliberate indifference"—which the plaintiff cites heavily—is inapplicable to this matter.

Based on the evidence presented, the Court finds that there is a genuine issue of material fact regarding whether the defendants engaged in "intentional discrimination." There is evidence from Mr. Langlois—CDL consultant with the OMV and one of the individuals present at the plaintiff's initial testing—that the reason the defendants did not allow the plaintiff to write his answers was because they "don't let anyone else do that" and based on his understanding, this was not allowed under the law. (Doc. 47-2, p. 29). Based on this assertion, the defendants did not intend to discriminate against the plaintiff because of his hearing disability, but rather, were simply enforcing the rules based on their understanding of the law and regulations. Accordingly, looking at the evidence in the light most favorable to the defendants, the Court finds there is at least a genuine issue of material fact regarding whether the defendants engaged in "intentional discrimination" by refusing to allow the plaintiff to write his answers.

5. Injunction

Finally, as the plaintiff does not even argue or cite to the legal requirements for an injunction, the Court cannot grant summary judgment for the plaintiff as to his request for an injunction. The plaintiff cites no law in his motion for summary judgment as to why there is no genuine issue of material fact as to his claim for an injunction. Accordingly, the Court refuses to grant summary judgment as to the plaintiff's claim that we "enjoin the [d]efendant[s] to take the action necessary to make its licensing program accessible to individuals with disabilities, and to refrain from taking adverse action against [p]laintiff's license on the basis of matters at issue in this suit." (Doc. 44-4, p. 31).

### Conclusion

Therefore, the Court **GRANTS IN PART AND DENIES IN PART** the Plaintiff Bruce Dunn's Motion (doc. 44) for Summary Judgment.

Signed in Baton Rouge, Louisiana, on April 14, 2014.

 

_____

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**